STATE of Tennessee, Plaintiff-Appellee,

v.

Hugh W. MELSON, Defendant-Appellant.

Supreme Court of Tennessee,
at Jackson.

Aug. 16, 1982.

George W. Hymers, Dist. Atty. Gen., James G. Woodall and R. C. Stegall, Asst. Dist. Attys. Gen., Franklin Murchison, Sp. Prosecutor, Jackson, William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

Mary Jo Middlebrooks, William H. Brown, Jackson, for defendant-appellant.

## OPINION

DROWOTA, Justice.

In this case, Hugh W. Melson appeals directly to this Court his conviction of first degree murder and the sentence of death imposed by the jury. He raises numerous issues in this appeal; but, after careful review of the entire record and the law, we find these issues to be without merit. We therefore affirm the conviction and the sentence.

The tragic and shocking killing for which Melson was convicted occurred on April 10, 1980. The victim was Barbara Lawrence, wife of Jack Lawrence, who owned a sizeable farm near Jackson. Melson was the farm foreman and had worked for the Law-

rences for years. He had known the family since his boyhood, as his father had also worked for them. Although Mr. Lawrence testified that Melson had had his problems getting along with people, he had been a satisfactory employee and no one had any real complaints about his prior behavior. He had a wife and family and lived on the Lawrence place.

## SUFFICIENCY OF THE EVIDENCE

■ The first issue which we shall address is Melson's challenge to the sufficiency of the evidence on which he was convicted. He argues that the verdict is contrary to the law and the evidence; and that the evidence preponderates in favor of his innocence and against his guilt. Since he stands convicted of this crime, he has lost the presumption of innocence which he carried at trial. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). All conflicts in the testimony must be resolved in favor of the State. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978); *State v. Townsend,* 525 S.W.2d 842, 843 (Tenn.1975). After viewing the evidence in the light most favorable to the State, we must affirm the conviction if any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); TRAP 13(e).

■ Jack Lawrence testified that in months prior to the killing, too much property (a chemical tank, chain saws, ladders, etc.) had been missing from the farm. Worst of all was theft of gasoline. During winter, Lawrence could not even attempt to keep gasoline at the farm. When the spring of 1980 arrived, and gasoline was again needed for farm work, Lawrence had the switch which operated the gasoline tank moved to a closet inside the house. He called all the farm workers together and told them that a log would be kept of all gasoline being used, even for personal purposes, and even by himself and his sons. He had told Melson that he could put a tank full in his truck every week, but Melson said that he would not need any until "combine time." Lawrence told Melson, then, to

remove the gas cans and siphoning hoses from his truck.

Early on the morning in question, Jack Lawrence and his son, Dick, who also lived with his own family on the farm, left home to spend the day fishing. Melson was at the main house to do some plumbing repairs. Mrs. Lawrence was at home, and their maid, Mattie Lewis, arrived at about 7:45. She testified that Melson was working on the hot water heater, which was in the utility room off the kitchen. She was in the den nearby; and at one point, Melson came in, opened the closet where the switch to the gasoline tank was, and went outside. Barbara Lawrence came in, asked who had opened the closet, and squatted down behind the bar. When Melson came back inside and went toward the closet, Mrs. Lawrence stood up, went outside to Dick Lawrence's truck, and returned to the house, telling Melson that he had taken some gas (in cans, in the bed of the truck) for himself. He denied this. She reminded him that her husband had told him that he could fill up once a week, and wrote the amount in the log book as going to Melson. He told her that he didn't want any of her gas and told her not to write it down. They both went outside and had some words. When she came back to the house, she was running, and had tears in her eyes.

A little while later, Mrs. Lawrence telephoned Kimba Lawrence, wife of her son Dick. She asked Kimba to do an errand which she had been planning to do. She stated that she was upset, telling Kimba the reason and the name of the person who had caused her to be upset. She stated that she did not want to leave the house. Kimba went to the Jack Lawrence house at about 9:00 A.M. and saw Mrs. Lawrence.

At about 11:00, Mrs. Lawrence and Jack Lawrence's mother met Kimba at a restaurant for lunch. While they were eating, Mrs. Lawrence told Kimba that the knot was finally leaving her stomach. The elder Mrs. Lawrence was present but did not hear that conversation. After lunch, all three women rode in Mrs. Lawrence's car to look for someone's house, then returned to the

restaurant, where Kimba got her own car and went her way.

At about 12:15, Mattie Lewis locked herself out of the house. After walking to the home of another son, Jack Lawrence, Jr., to see where a key might be, she returned to the house and was sitting outside when Melson drove up in his truck. She asked if he had a key, and he responded angrily, asking if she had not "heard Miss Barbara raising hell with him about the gas." "He said that Miss Barbara couldn't tell Mr. Jack and have Mr. Jack coming back there raising hell with him." He also asked Mattie Lewis to tell Mrs. Lawrence that he had their aluminum ladder.

Mrs. Lewis waited another fifteen or twenty minutes, and was driving in her own car down the road, when Barbara Lawrence drove by. They both drove to the home of Jack Lawrence's mother, then went to Barbara's house in her car. After Mrs. Lewis worked for awhile longer, discovering that there still was no hot water, Mrs. Lawrence took her back to her car, and they separated.

Meanwhile, according to Henry Shanklin, a retired farm hand who still lived on the place, Melson arrived at his house to repair the roof at about 1:00. A relative of Shanklin, Jerry Ingram, was also there. Ingram and Shanklin went to work giving shots to and putting rings in the noses of two hogs. When Melson finished on the roof, he helped with the hogs. Ingram then left with his wife, Dora, and Shanklin's daughter.

Shanklin and Melson got into Melson's truck and drove to a store on the main road to buy two quart bottles of beer. When they were almost out to the road, they saw Mrs. Lawrence drive past. Melson said to Shanklin that he was in a world of trouble because Mrs. Barbara Lawrence saw him taking gasoline. Shanklin responded, "ah, you ain't in no trouble," but Melson repeated that he was. Mattie Lewis testified that as she was driving away from the elder Mrs. Lawrence's home, on her way to someone else's house, she saw Melson and a passenger behind her in Melson's truck.

The proprietress of the store, Mary Jones, stated that Melson came in and made the purchase at about 2:30, remaining only briefly. When the two arrived back at Shanklin's house, Melson let Shanklin out and drove on, saying that he had to go and do "his other little job."

At about 3:00, Melson returned in his truck to Shanklin's, called out to him, and came inside, where he drank most of his beer. Shanklin said that he was "some different"—he seemed more tired, but not out of breath. Shanklin's daughter and Dora Ingram came back. When Melson heard them approaching, he appeared uneasy, got up, turned around and looked.

A few minutes after 3:00 P.M., the Lawrences' third son Jon, who was a high school student, arrived home. He noticed that the door was unlocked, which was unusual. When he went to the kitchen to get a snack, he discovered his mother dead on the utility room floor. He ran to Kimba Lawrence, who had just arrived at her house nearby, and who called the sheriff's office. Deputies began arriving at about 3:30 and closed off the area where the killing took place. Kimba immediately told the deputies of Mrs. Lawrence's altercation with Melson, and some officers went off in search of him.

They eventually found him sitting inside Shanklin's house at about 4:10 P.M. The officers asked him to come outside, and they told him that they were "investigating an incident." They took him to the Lawrence house in the back seat of their car. When they arrived, there were many people milling about, and there were official cars and an ambulance parked outside. The officers read Melson his *Miranda* rights, which he affirmatively indicated he understood. Then, one of the officers noticed spots of blood on his clothing, which did not appear dry, darkened or faded; and asked him about it. He said that it had gotten on him when he was "shooting hogs." He was not interrogated further at that time, but was taken to the county jail.

During the entire time, he never inquired what had happened or why he was being held. He never showed surprise, mystifica-

tion, or curiosity. He was quiet and cooperative.

The sheriff's deputies and local medical examiner described the death scene, and pictures and diagrams were introduced into evidence. Mrs. Lawrence was lying face down on the utility room floor with her feet near the kitchen. She was lying in a large pool of blood running from her head through and into the kitchen. There was a great deal of blood splattered around the room, on the floor and several feet up the walls. Particles of brain and skull were on the floor. Mrs. Lawrence upon initial examination was found to have a gaping hole in the back of her skull, through which portions of her brain extruded.

At the hospital, a more complete examination was done. Her skull was broken and there were pieces of cranium inside her head. There were bruises and injuries to the eye, face, neck and chin. There were also trauma to her arms and a broken finger, which were consistent with defensive injuries which one would sustain while fending off blows. The conclusion was that the injuries had most likely been caused by blows from a blunt instrument. The time of death was at first estimated to be about 2:00 P.M., but was soon revised to 3:00 P.M. None of the blood had begun to dry when the officers arrived at 3:30.

The body was then sent to Memphis for a complete autopsy. The official cause of death was multiple blunt trauma to the head and neck. The weapon was a firm instrument with different surfaces, one being circular. There had been approximately 15–30 blows to the head, with additional ones to the arms and hands. There would have been considerable force applied with repeated blows in the same area, in order to drive a hole of this magnitude in the skull, even by a strong assailant.

Early on the evening of the 10th, Melson's truck was impounded and sealed in the basement of the county jail. A warrant was issued the next afternoon, and the truck was searched. Recovered were some pieces of cloth; a syringe; and, inside a tool box, a ball peen hammer and a crescent wrench. All of these, except the syringe, had what could have been blood on them. (We surmise that the syringe was taken because of Melson's story about getting blood on him while giving shots to hogs.) The shape of the ball peen hammer was consistent with the wounds and bruises suffered by Mrs. Lawrence.

Also found on the hammer, imbedded in the substance suspected to be blood, was a hair. Found on Mrs. Lawrence's blouse was another hair. Samples of hair were taken from Melson and Mrs. Lawrence. An FBI agent testified about hair characteristics and matching. He stated that, when the twenty or so characteristics of a hair match a known sample, there is only once chance out of 4,500 or 5,000 that the unknown hair came from a different individual; further, the unknown person would have had to be in the same place as the known person. The hair on Mrs. Lawrence's blouse exactly matched the samples from Melson's head. The hair on the hammer exactly matched hair from Mrs. Lawrence's head. Making it even less likely that the hair on the hammer had come from anyone else was the fact that such hair had no root on it; it had been broken or torn off in the middle of the shaft, showing that it had come out as the result of force being applied.

Another FBI agent, an expert in forensic serology, testified about the nature of the substance on Melson's clothing (cap, shirt, pants and boots) and the objects from his truck. He described the process by which he identified blood on the clothing, the hammer and the wrench. Further, on the clothing and hammer, but not on the wrench, there was enough blood to determine that it was human. The agent found that the blood did not come from hogs. There was not enough blood in any spot to identify the blood type or grouping.

A very important witness was Mr. Herbert L. MacDonnell, who was, to simplify his occupation, an expert in the character of various types of blood stains. He examined Melson's clothing after the FBI had determined it to be stained with human blood. He found over 550 tiny spots of blood on

the shirt and pants. On the shirt, the blood was concentrated on the right front and right forearm. It was spattered all over the front of the trousers. There was blood on the underside of the right pocket flap on the shirt, showing that Melson's right side was in motion when the blood hit him. This was consistent with a raising of the right arm. The shirt would have had to be very close to the source of the blood, in order for a spot to have been produced there.

There was also a spot on the back of the shirt, over the right shoulder or shoulder blade area. This was consistent with blood dripping off the weapon as the right arm was raised over the shoulder. There was also a stain on the shirt, which was made by wiping. In his expert opinion, the outline of the hammer was reflected in the outline of this stain.

Some stains were spattered on the left side of the right boot, and on the brim of the cap.

MacDonnell gave an extremely clear explanation, accompanied by a demonstration, of the difference between a typical drop of blood and the spray on Melson's clothes. The latter were very fine droplets which could not have been produced without some kind of energy to overcome the surface tension of a normal sized drop of blood. That is, some force had been applied which had caused the drops to pelletize. The number of droplets present would have required several impacts, not just a few blows. The spots resulted from medium velocity blows, about 25 feet per second, which force was consistent with beatings and stabbings. The entire scenario was consistent with what would happen when a head was struck repeatedly by a blunt instrument.

Based upon the foregoing circumstantial evidence, we have no hesitancy in holding that the evidence against Melson was sufficient to support the first degree murder conviction beyond a reasonable doubt. The evidence does not preponderate in favor of his innocence and against his guilt.

## VALIDITY OF WARRANTLESS ARREST

When the officers arrived at the Lawrence home in response to the call about finding Mrs. Lawrence, they had a conversation with Mrs. Lawrence's daughter-in-law, Kimba Lawrence. Kimba told them of the discussions which she had had earlier that day with Mrs. Lawrence. As a result of this report, the officers went to where Melson was at the time—at the home, on the Lawrence farm, of the retired farmhand, Henry Shanklin. They took him into custody, handcuffed him, and took him by car back to the Lawrence house. There they noticed what looked like spots of blood on his clothing and formally arrested him, advising him of his rights. All of this took place within about an hour of Mrs. Lawrence's body being found.

█ Since there was no warrant, we must pass upon the validity of the arrest under the statute permitting an officer to make a warrantless arrest when a felony has been committed and he has reasonable or probable cause to believe that the arrestee committed the felony. TCA § 40–803(3). It is conceded that probable cause must be more than mere suspicion, *West v. State*, 221 Tenn. 178, 425 S.W.2d 602 (1968), but neither must it be absolute certainty, *Grey v. State*, 542 S.W.2d 102 (Tenn.Cr.App. 1976). Reasonable or probable cause consists of grounds which would lead a reasonable man to believe that the person arrested was guilty of the felony, *Davis v. State*, 2 Tenn.Cr.App. 297, 453 S.W.2d 438 (1969). In *Davis*, we quoted from *Jones v. State*, 161 Tenn. 370, 33 S.W.2d 59 (1930), wherein it was stated:

"In *Beck v. State of Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the [United States Supreme] Court stated:

'Whether that arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to

warrant a prudent man in believing that the petitioner had committed ... an offense.'"

453 S.W.2d at 440.

"In dealing with probable cause, one deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327." *State v. Jefferson,* 529 S.W.2d 674, 689 (Tenn.1975).

■ We hold that the trial court was entirely correct in ruling that probable cause for Melson's arrest had existed, at the time they took him into custody at Shanklin's house on the basis of what Kimba Lawrence had related; and certainly after they observed what was apparently blood on his garments in view of the quantities of blood which had been shed at the murder scene. Therefore, the evidence taken from Melson incident to the arrest—his cap, shirt and trousers and boots—was admissible at trial. This issue is without merit.

## VALIDITY OF SEARCH WARRANT

■ Defendant attacks the validity of the search warrant issued to authorize the search of his truck, which was retrieved from Henry Shanklin's residence early in the evening of the murder, towed to police headquarters, and sealed there, not being entered until after the issuance of the warrant. This took place at 1:55 P.M. the next day, April 11, 1980.

We have serious problems in reviewing the merits of this argument. On September 26, 1980, defendant filed a Motion to Suppress Evidence and Return Property, disputing both the warrantless arrest of defendant, which we have already dealt with, and the validity of the search warrant. The language of the grounds in support of the Motion is ambiguous, but they appear to be essentially as follows: (1) That there was no probable cause to issue the warrant, and no justification for a warrantless search. (2) That the information on which the warrant was issued could not

have been verified on the face of the warrant. (3) That it was not properly executed. (4) That the evidence seized was beyond the scope of the warrant. (5) Any other reason presented at the oral hearing.

On October 10, defendant filed a Memorandum on Motion to Suppress Evidence. This did not purport to amend the September 26 Motion, but some of the issues argued in the Memorandum were different from the grounds in the Motion. New grounds were: (1) That the warrant was issued based upon reckless misrepresentation of the affiant to the issuing officer. (2) The affidavit did not establish a time reference for many of the facts stated. (3) The affidavit did not provide a nexus between the crime and the truck. On the other hand, the ground in the Motion that the warrant was not properly executed was apparently abandoned; it was never mentioned again.

Stapled to the October 10 Memorandum was a photocopy of the search warrant. Thus, the only place in the record in which the warrant appears is as an attachment to a memorandum in support of a motion. It is not referred to in the memorandum as being incorporated therein. It was not introduced as evidence at the suppression hearing. Despite the provisions of TRAP 24 abolishing the distinction between the bill of exceptions and the technical record, we must say that the manner in which the warrant was placed in the record falls short of what is needed in order for it to be reviewable on appeal. *Krause v. Taylor,* 583 S.W.2d 603 (Tenn.1979).

The closing arguments of the defense and the State at the suppression hearing were not transcribed, so we cannot tell what grounds the defense pressed at that point. We must base our discussion solely upon what appears in the transcript. The evidence at the hearing was directed toward establishing the timing of events and the visibility of blood on Melson's clothing. Defense counsel commented that these facts were shown in her memorandum, but counsel wanted the court to hear from the wit-

nesses themselves. The court expressly stated his conclusion that the defense was basing its entire challenge on the ground that the affidavit and warrant misstated the true facts. Defense counsel agreed that the court's conclusion was correct. Consequently, this was the only ground addressed by the court in overruling the motion to suppress the warrant.

Assuming arguendo that the warrant is in the record, the "reckless misrepresentation" ground should be the only one which we review. However, we shall address the other issues raised in this appeal. (The State did not include in its brief any argument upon the merits of this issue, relying entirely upon its assertion that the warrant is not properly in the record and thus not reviewable.)

Reckless Misrepresentations in Affidavit

■ Defendant attacks the validity of the search warrant by asserting that the affidavit on the basis of which the warrant was issued contained reckless misrepresentations of material facts. Under *State v. Little,* 560 S.W.2d 403 (Tenn.1978), this is one ground upon which a warrant may be invalidated.

■ The trial court in this case, at the close of the suppression hearing, specifically found that there had been no false statements either intentionally or recklessly made by the affiant. We do not find that the evidence preponderates against the court's holding.

Defendant argues that the affidavit states that he left Henry Shanklin at around 2:00 and returned in about half an hour. He says, however, that the combined testimony of Shanklin and Mary Jones, who sold him the beer, showed that he left Shanklin at about 2:45. There is no indication that the officers had talked to Mary Jones at the time the affidavit was given. As to Mr. Shanklin, he had no clock, was very vague about telling time, and only a limited version of the facts was available at the time of the affidavit.

The second allegedly reckless statement was made by "a reliable source" who said that Melson was seen in his truck immediately before the estimated time of death. This reliable source is admitted by defendant to be Mattie Lewis, the Lawrences' maid. She had locked herself out of the house and was sitting outside when Melson drove up in his truck. She hailed him to ask if he had a key, and he angrily mentioned his argument with Mrs. Lawrence that morning. Mrs. Lewis did later see Mrs. Lawrence alive. (Mrs. Lewis testified at trial that she had seen Melson and someone else in Melson's truck after Mrs. Lawrence had driven her to where her car was parked. It is unclear whether the authorities knew this when the warrant was obtained.) In any case, the word "immediately" may have been less precise than, for example, "shortly" or "a little while." Since the trial court held that any imprecision did not amount to a false statement recklessly made, we shall resolve the issue in favor of his holding. To do otherwise would be to make overly fine distinctions.

Time Reference for Facts Stated

■ References to time in the affidavit supporting the search warrant relate to information received within the previous twenty-four hours, that is, on April 10, 1980. Defendant argues that although the affiant received the information at such time, the facts which comprised such information could have taken place at any time.

It is clear from the affidavit that Melson told Shanklin on April 10 that he was in "a heap of trouble," because "Miss Bobby" had caught him stealing gasoline; and that he had to tend to some business. Thus, the only references which are arguably uncertain are when Barbara Lawrence and Melson had had the argument about stealing gasoline, and when Kimba Lawrence learned from Barbara of the argument. This is not sufficient to invalidate the search warrant, because it is clear that the incident was present in Melson's mind near the time of the murder, based upon what he told Shanklin. We hold that the affidavit in question

establish[ed] a time during which the illegal activity occurred so as to make it

appear to the magistrate that the illegal occurrence is not too remote to establish probable cause at the time of the application for [the] search warrant.... [T]here is no rigid rule or specific language required to establish the time element.

*State v. McCormick,* 584 S.W.2d 821, 824 (Tenn.Cr.App.1979).

### Specificity of Description of Property to be Seized

 The description in the warrant of the property to be searched for and seized is, "a blunt object, knife, or object capable of being used to strike, stab, cut, penetrate, and other paraphernalia pertaining to this incident," contained in the described vehicle. Defendant argues that this description is not sufficiently specific and thus authorizes a general search. He emphasizes the words, "any other paraphernalia," while ignoring the modifying and limiting words, "pertaining to this incident." The objects removed from the truck were: a ball peen hammer, a crescent wrench, a shirt, a couple of rags, a piece of rug and a syringe.

The authorities could not know precisely what evidence pertaining to the Lawrence murder would be in the truck until they searched it. Obviously, there could well have been evidence therein other than the potential murder weapon. Certainly, it would be reasonable to anticipate that there might be items which would appear to have blood on them, in view of the quantities of blood at the death scene and the blood spattered all over the garments in which the defendant was arrested. When Melson was arrested and read his rights, and then was asked why all the blood was on his clothing, he explained its presence by saying that he had been giving shots to some hogs. Melson's own statements made the syringe relevant.

We find that the cases cited by defendant, holding search warrants to be overbroad, are distinguishable from the case at bar. Rather, this case is analogous to fact situations such as those in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), and *Armstrong v. State,* 548 S.W.2d 334 (Tenn.Cr.App.1976). In *Andresen,* authorities seized files from offices of a lawyer they had probable cause to believe had committed fraud in a land transaction. The warrant in that case contained a long list of particular items, and then included the phrase, "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." The Court held that this phrase must be read in the context of the description of items relating to the land transaction in question. The warrant thus did not authorize a general exploratory search but sufficiently limited the authority to search while giving the officers needed discretion.

In *Armstrong,* we do not have the language contained in the warrant, but there was a search of premises where a drug selling operation was allegedly being carried on. Defendant objected to the seizure of checks, bank documents, personal letters and drug paraphernalia because they were not described in the warrant. The Court of Criminal Appeals held that "[t]he relevance of the evidence seized is apparent. The identifying bank and personal documents were relevant in establishing proof of possession of the premises and ultimately of the drugs. The drug paraphernalia went to the proof that drugs were kept on the premises. All evidence was properly seized." 548 S.W.2d at 336.

We hold that this argument is without merit.

 Defendant makes another related argument: that the affidavit requests authority to search any box or container in the truck, but the warrant does not specifically include such box or container. It authorizes search of "the truck." However, the outside of the warrant—that which would show when the warrant was folded and served—says

STATE OF TENNESSEE

VS.

HUGH W. MELSON

1974 Green Ford Pickup Truck

License No. 7J469A and any containers and boxes found therein.

The conclusion is inescapable that the omission of "boxes and containers" from the warrant was merely inadvertent. The emphasis should be upon whether a "neutral and detached" magistrate could properly have found probable cause, which we hold elsewhere herein that he could. Obviously any boxes and containers were in the minds of the affiant and the magistrate. The affiant was not attempting to deceive anyone. A commonsense approach would dictate that the warrant was meant to authorize the search of the truck's contents. Also, we repeat that no evidence was presented on this point at the suppression hearing. We hold that this argument is without merit.

### Basis in Affidavit for Crediting Hearsay Evidence Contained Therein

The warrant to search Melson's truck was issued upon the affidavit of Lt. James Jowers of the Madison County Sheriff's Department. The sources of the information contained in the affidavit are as follows: Kimba B. Lawrence, daughter-in-law of Mrs. Lawrence; Jon Lawrence, the victim's son; the affiant's personal observation; Henry Lee Shanklin, a retired farm employee of the victim's husband; the Assistant County Medical Examiner; and "a reliable source."

■ Melson argues that, although hearsay may provide the basis for a finding of probable cause upon which to issue a search warrant, the affidavit must also contain a substantial basis for crediting the hearsay. He contends that there is nothing in the affidavit to show that the above-listed sources of information were credible or that the information was reliable. Melson cites the line of cases including, chronologically, *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); and *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Melson's reliance upon this line of cases is misplaced. A clear distinction has developed between the type of informant whose information was used therein, and the type of informant referred to in Lt. Jowers' affidavit. What we have in the present case is the so-called "citizen-informant," or "informant not from the criminal milieu." The reliability of such informants and the information which they provide are judged by a different standard than that of the typical criminal informant or "tipster."

Many federal and state courts have recognized the inherent difference between the two types of informants. As the Fifth Circuit Court of Appeals noted in *United States v. Bell,* 457 F.2d 1231 (5th Cir. 1972):

The rationale behind requiring a showing of credibility and reliability is to prevent searches based upon an unknown informant's tip that may not reflect anything more than idle rumor or irresponsible conjecture. Thus, without the establishment of the probability of reliability, a "neutral and detached magistrate" could not adequately assess the probative value of the tip in exercising his judgment as to the existence of probable cause. Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they have either been the victims of the crime or have otherwise seen some portion of it. A "neutral and detached magistrate" could adequately assess the probative value of an eyewitness's information because, if it is reasonable and accepted as true, the magistrate must believe that it is based upon first-hand knowledge. Thus we conclude that *Aguilar* and *Spinelli* requirements are limited to the [criminal] informant situation only.

*Id.* at 1238–1239.

It was held in *United States v. Rollins,* 522 F.2d 160 (2nd Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324

(1976), that the fact that information given by the informant is based upon his personal observation is a reliable basis for his conclusion that his statements are true. The case also addressed the defendant's arguments that the affidavit therein "fails to meet the second requirement of *Aguilar* that there be some showing of the trustworthiness of the informant himself," 522 F.2d at 164. Some of the court's statements in holding this argument without merit were:

We have previously recognized that the language in *Aguilar* and *Spinelli* was addressed to the problem of professional informers, [citation]. In this case, Williams was not an anonymous paid informer, but an identified bystander with no apparent motive to falsify. The report of such a person has a "peculiar likelihood of accuracy" .... Specific allegations of reliability or past reliable contact are not required when the informant in question was an eyewitness to the crime. [Citations].

*Id.*

Even in cases of unnamed paid informants, the court noted,

we have not *required* a recitation that an informant shall have previously supplied accurate information, but have merely held that such a recitation would be sufficient to justify reliance on the informant's story [citations]. "Such a recital ... is only one way of validating hearsay used to obtain a search warrant—not a ritual that must be invariably observed even when the circumstances render it inappropriate." [Citation.] The principle to be applied is that the magistrate must have a " 'substantial basis' for crediting the hearsay." [Citations]. In this case, Williams' information was based upon his personal observation and furnished adequate detail to meet this criterion. Moreover, the information provided by Williams was amply corroborated.... We reject appellant's contention that corroboration must directly link the suspect to the commission of the crime.

"An untested informant's story may be corroborated by other facts that be-

come known to the affiant, even if they corroborate only innocent aspects of the story."

*Id.* at 164–165.

The search warrant challenged in *United States v. Unger,* 469 F.2d 1283 (7th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (1973), did not specifically allege the reliability of the informant, a citizen who had done work on defendant's premises. However, the court held that the affidavit contained specific statements of fact.

The allegations of the complainant are not self serving nor does it appear that the accusations by the citizen were reported to the police merely to spite defendant Unger. The Complaint emphasizes the very circumstances from which the magistrate herein could determine that the information given by the citizen was "credible" or the informant was "reliable".

469 F.2d at 1286–1287. Thus, " 'the internal content of the affidavit *intrinsically* prove[d] the truth of the ... citizen's word,' " *id.* at 1286, *citing United States v. Roman,* 451 F.2d 579, 581 (4th Cir. 1971) (emphasis added).

In *United States v. McCoy,* 478 F.2d 176 (10th Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62 (1973), defendant was convicted of skyjacking and challenged a search warrant which had been issued based upon information given to the FBI by, e.g., a passenger and a stewardess from the aircraft, and a former acquaintance of defendant. In holding the warrant valid, after discussing the distinction between citizen informants and criminal informants, the court concluded,

Without belaboring what we deem to be quite obvious, the affidavit of [the FBI agent] in the instant case was amply sufficient to permit the magistrate to exercise his independent judgment as to the reliability of the various sources of information. Indeed, on the basis of the affidavit before him, the magistrate could only have concluded that probable cause

did exist for the issuance of a search warrant.

*Id.* at 179.

The Supreme Court of Colorado held in *People v. Hubbard,* 184 Colo. 225, 519 P.2d 951 (1974) that when the source of information is an identified citizen-witness, "the information is presumed to be reliable, and prosecution is not required to establish either the credibility of the informant or the reliability of his information. [Citations.]" 519 P.2d at 953.

An often-cited case distinguishing the citizen informer from the " 'traditional police informer' " is *State v. Paszek,* 50 Wis.2d 619, 184 N.W.2d 836 (1971), wherein the court held that the "reliability of such a person [citizen-witness informer] should be evaluated from the nature of his report, his opportunity to hear and see the matters reported, and the extent to which it can be verified by independent police investigation." 184 N.W.2d at 843.

▌ A sub-issue which must be discussed is whether or not the citizen informant must be named in the affidavit, since the nexus in the present case between Melson's truck and the murder of Mrs. Lawrence was provided by a person referred to in the affidavit as "a reliable source." We have no difficulty in holding that the name of the source is not required, as a matter of law, to be disclosed in the affidavit. The reliability of the source and the information must be judged from all of the circumstances and from the entirety of the affidavit. The name of the source is only one factor to be considered.

The United States Supreme Court held in *United States v. Harris,* 403 U.S. 573, 584–585, 91 S.Ct. 2075, 2082–83, 29 L.Ed.2d 723 (1971),

It will not do to say that warrants may not issue on uncorroborated hearsay. This only avoids the issue of whether there is reason for crediting the out-of-court statement. Nor is it especially significant that neither the name nor the

person of the informant was produced before the magistrate. The police themselves almost certainly knew his name, [and] the truth of the affidavit is not in issue . . .[1]

A search warrant was issued based upon information from several sources in *United States v. Melvin,* 596 F.2d 492 (1st Cir. 1979). The crime was the bombing of a tavern, and one of the sources was "an unknown male" who "stated that a white Cadillac had left the scene moments before the explosion." *Id.* at 494. The defendant argued that the "unknown male's" statement should not be credited because his credibility and the information's reliability had not been demonstrated under *Aguilar* and *Spinelli.* We shall quote the court's observations because they are so closely analogous to the case at bar:

We do not, however, regard the "unknown male's" statement as an informant's tip subject to *Aguilar* and *Spinelli.* We view it instead as the statement of a bystander witness. While the affidavit does not expressly disclose the source of the "unknown male's" information, the nature of the information he provided and the circumstances of his "on the scene" report could strongly suggest to the issuing judge that he was relating what he had personally observed. And, his statement was not at all in the nature of an informant's tip—it was non-accusatory and did not describe criminal activity. He merely stated . . . a detail innocuous by itself. Its significance lay in its fitting in with other facts which such a bystander would presumably not know. To be sure, it would have been preferable for the affidavit to have identified the "unknown male" and to have specified whether he had personally observed the Cadillac leave the scene. But we must interpret the affidavit "in a commonsense and realistic fashion," eschewing "[a] grudging or negative attitude" and recognizing that affidavits for search warrants are normally drafted by non-

---

1. *Harris,* of course, involved an informant from the criminal milieu. Thus, a higher standard of proof of credibility and reliability was required than in the case at bar and others like it.

lawyers in the midst and haste of a criminal investigation." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). From that perspective, the reasonable implication of the affidavit is that the "unknown male" was a bystander witness, not an informant. Treating him as such—and taking into account that the statement, which formed a single link in a circumstantial chain, was non-accusatory—we think the demonstration of credibility and reliability that would be required under *Aguilar* and *Spinelli* in the case of an informant is not required here.

*Id.* at 497.

A similar case was *State v. Huff,* 220 Kan. 162, 551 P.2d 880 (1976), wherein defendant had been convicted of aggravated robbery of a store. After officers had obtained descriptions of the four robbers from store employees, and were searching the area in patrol cars, "an individual" ran up to them and described four people whom he had seen running into a building. The defendant challenged his arrest, but the court held that the information from the "individual" coupled with the other facts which were known to the officers, gave them probable cause to arrest defendant. The court noted that the individual did not relate facts pertaining to the crime, but only to four people who, it turned out, matched the descriptions of the robbers. "There is nothing in the record suggesting that it was *unreasonable* for Officer Baker to believe the individual other than the mere fact he was unknown." 551 P.2d at 884 (emphasis added). This was not a reason to disbelieve the information.

*Accord, State v. Kurland,* 130 N.J.Super. 110, 325 A.2d 714 (1974).

■ The foregoing discussion sets forth the standards by which we must review the affidavit supporting the warrant for the search of Melson's truck. We would only add the general propositions that affidavits must be looked at and read in a commonsense and practical manner, *United States v. Harris, supra; United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Kurland, supra;* et al., and that the finding of probable cause by the issuing magistrate is entitled to great deference, *United States v. Melvin, supra,* 596 F.2d at 498, *citing United States v. Ventresca, supra; United States v. Unger, supra,* 469 F.2d at 1286, *citing Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *State v. Kurland, supra.*

■ We hold that the affidavit in this case contains sufficient statements upon which the issuing magistrate properly found probable cause. Each citizen informant provided a piece of information to the affiant innocuous in itself, but which fit with the other pieces of information in a way which linked Hugh Melson and his truck to the killing of Barbara Lawrence. The averments in the affidavit came from several sources, unlike many cases where probable cause can be established from only one informant. The statement from the "reliable source" is self-verifying, in that it contains nothing speculative. The source clearly knew who Melson was; knew that the truck was Melson's; and knew that the place where it was seen was the Lawrence residence. Such information could only have come from someone who belonged in that immediate area—a neighbor, employee, or relative. In fact, it is conceded that the "source" was Mattie Lewis, the Lawrences' maid, who testified at the preliminary hearing and trial. There is no indication in the affidavit of a deliberate attempt to keep the "source" anonymous; she was simply not named.

Each case must be looked at under its own facts, and the existence of probable cause must be reviewed under all the circumstances. The combination of circumstances present as outlined in Lt. Jowers' affidavit supports the magistrate's finding of probable cause.

Having thus held, we cannot help admonishing law enforcement officials that this affidavit falls far short of the ideal. It should by no means be considered a model for those who must draft affidavits in the

future. "The affidavit in this case obviously was poorly drawn.... Moreover, there would appear to be no reason why the identity of the informants should not have been disclosed." *State v. Kurland, supra,* 325 A.2d at 716.

On the other hand, defense counsel did not pursue the reliability and credibility issue at the suppression hearing. As noted above, the court interpreted the entire thrust of the defense's argument as being that the affidavit had contained misrepresentations intentionally or recklessly made. Counsel acknowledged this interpretation as being correct. There was no exploration of the facts surrounding the issuance of the warrant. *United States v. Wilson,* 479 F.2d 936, 939 (7th Cir. 1973). We make this statement, although it is not the basis for our holding, since the affidavit is sufficient, as a matter of law, on its face.

## BAIL

Melson was held without bail after his arrest, pending action of the county grand jury. The grand jury indicted him for first degree murder on May 5, 1980. On May 12, defendant filed the first of the motions from which he now appeals—a Motion to Set Bail. Defendant's brief recites, but the record in no way reflects, that a hearing was held on the Motion on May 16, as a result of which bail was set at $200,000.

The next item in the record relating to bail is a Motion for Reduced Bail, filed September 26, 1980. Again, Melson's brief states, but the record does not reflect, that the court heard the motion on October 3 and declined to reduce bail. Defendant here argues that the setting of bond at $200,000 amounted to "excessive bail" in violation of the Eighth Amendment of the United States Constitution and Art. 1, §§ 15 and 16 of the Tennessee Constitution. The State again relies on the fact that the record contains no transcripts of the bond hearings and argues that the matter is not reviewable. *Wiley v. State,* 552 S.W.2d 410, 413 (Tenn.Cr.App.1977).

██ While it is true that there is very little in the record for us to review, we would point out that under Art. 1, § 15 of our Constitution, bail may be denied altogether in a capital case "when the proof is evident, or the presumption great." This provision was the basis of the State's argument, at the preliminary hearing, that bail should be denied; and in fact it was denied. The trial court has very wide latitude in setting bail, and we are most reluctant to second-guess the court in this case. Even if the amount set was more than Melson was in fact able to raise, there is no showing that the court's purpose in setting such amount was to prevent Melson from gaining his freedom rather than properly to assure that he would appear in court.

██ TRAP 8, which governs review of trial court orders affecting release conditions both before and after conviction, was in effect at the time of the proceedings in question; and prior to that, TCA § 40–1204 had dealt with appeal of pre-conviction release orders. Melson's only *effective* remedy for the setting of bail at $200,000 would have been to follow Rule 8 promptly after bail was set—not to wait until after conviction. His case could have been ruled on before he spent months in jail. He gains nothing by appealing the amount of bail at this point. There is no ground for holding that the amount at which bail was set, even if it were excessive, more probably than not affected the outcome of the case. The appeal of this issue at this point is of no practical effect or benefit to the defendant.

## PARTICIPATION BY DEFENDANT AT TRIAL

On October 6, 1980, Melson's counsel filed a Motion to Allow Defendant to Participate at Trial. There is no indication that this Motion was argued, or what entered into the court's apparent decision to overrule it. The grounds for the Motion were: (1) It was evident that the trial would be lengthy and complex. (2) A defendant has the right under the Sixth Amendment of the United States Constitution and Art. 1, § 9 of the Tennessee Constitution, to "participate fully in his own defense." (3) This "right has

been recognized by this Court in *State v. Burkhart,* 541 S.W.2d 365 (Tenn.1976)." (4) That the conditions outlined in *Burkhart* for participation by Melson *in propria persona* as well as by counsel had been met.

■ The right of a defendant to participate in his own defense is an alternative one. That is, one has a right *either* to be represented by counsel *or* to represent himself, to conduct his own defense. *Burkhart, supra,* and cases cited therein. It is entirely a matter of grace for a defendant to represent himself and have counsel, and such privilege should be granted by the trial court only in exceptional circumstances.

■ The mere facts that a defendant is not seeking to disrupt the trial proceedings and that he may be intelligent do not require a trial judge to allow a defendant represented by counsel to participate. These are only threshold considerations. Further, we do not find that the length of a trial or the involvement of the death penalty constitute "exceptional circumstances." These factors are present far too often to be "exceptional." If hybrid representation were to be allowed in every lengthy and/or capital case, then by definition it could not be granted "sparingly and with caution." *Burkhart,* 541 S.W.2d at 371. We shall not set forth what would constitute exceptional circumstances.

Melson was represented by two very competent attorneys, and there is no indication that he did not have the opportunity to consult with them or give them his views. There is no evidence to support the defendant's contention that the trial judge abused his discretion in failing to allow him to participate at his trial. We certainly do not feel that denial of this Motion more probably than not affected the outcome of the case, TRAP 36(b).

## CONTINUANCE

■ A week before the scheduled trial date, Melson filed a Motion for a Continuance, supported by an affidavit. The trial court apparently overruled the motion, and defendant appeals. The record contains nothing on the basis of which we could find error. There is no transcript of any hearing; two letters referred to in counsel's affidavit as being forthcoming are absent; there is no showing that defense counsel could not have obtained the evidence and assistance referred to in the motion sooner than she did. One ground for the motion was the fact that the defense had not received a report of the mental examinations conducted at the Middle Tennessee· Mental Health Institute. However, the court allowed the psychological evaluator from the Institute to testify over the State's objection, as a witness for the defense. His testimony was highly favorable to Melson.

Continuances are not customarily granted merely as a matter of course, and we cannot reverse the verdict in this case where it cannot be clearly shown that the trial court abused his discretion in denying the continuance.

## VENUE

On May 23, 1980, Melson moved for a change of venue. Attached to the motion were newspaper articles and transcripts of broadcasts about the event, along with affidavits from individuals asserting that Melson could not receivê a fair trial in Madison County. The State asserted that a fair trial could be had, submitting its own affidavits. A hearing, not transcribed, was held on May 30, at which the court overruled the motion. On June 25, the court ordered everyone involved for the State and the defense, not to make, issue or disseminate any extrajudicial statements concerning the litigation.

In our opinion, the trial court ruled correctly. The pretrial publicity occurred between the death and the indictment, as stated above. The publicity died down after the indictment in mid-May, and the trial was not held until mid-October. All of the reportage was factual in nature, except for one editorial from each Jackson paper. These were restricted to the sad event of Mrs. Lawrence's death, and did not deal with the suspect, the investigation, the weapon, or anything else concerning de-

fendant. None of the news articles or transcripts was sensational, improper, or in poor taste. A statement by one of the attorneys general, the publication of which is complained of by defendant, is a quotation from his argument to the court at the preliminary hearing, concerning whether or not bail should be set.

We turn to voir dire, and relate the following facts to place it in perspective: The voir dire took a day and a half; fifty veniremen were examined for the regular panel and seven for the selection of the one alternate. The court excused for cause fifteen veniremen for the regular panel and four for the alternate. Of these, six stated that they would automatically vote against the death penalty. One alternate venireman was excused because he had heard mentioned in the waiting room something about the questions being asked on voir dire. Six veniremen personally knew the family and six others had already formed an opinion in the matter.

Of the twenty jurors against whom defendant's brief specifically alleges bias due to publicity, ten were among those excused for cause. Since the venire was not exhausted when voir dire ceased, defendant was not prejudiced by the exclusion of these veniremen as possible jurors.

The defense, which had sixteen challenges to the State's eight, did not exhaust its peremptory challenges early in the voir dire. Three peremptory challenges were exercised on selection of the alternate.

Eight veniremen had indeed heard nothing about the crime. Five were peremptorily challenged and three sat on the jury. One of the latter was specifically mentioned in the defendant's brief as being biased because she had gone to school with the victim. This had been in the 1940's, and they had had no contact since then. Further, this juror had taught Melson's daughter; and one defense attorney was a close friend of someone who we infer was the juror's daughter.

Defendant points to nine other veniremen as having been biased by publicity. Three sat on the jury. They remembered some general facts about the case, but their answers to voir dire affirmatively showed lack of bias. The remaining six veniremen were peremptorily challenged. These had perhaps more specific recollections of the facts of the crime, or described their feelings about it as being shock or horror. However, these people also expressed their ability to be fair, to hear the case impartially; and stated that they had formed no opinion as to the guilt of Melson himself.

■ In reviewing the law governing change of venue, we first note that under T.R.Cr.P. 21, the decision of whether or not to change the venue is for the sound discretion of the trial court and may not be reversed on appeal absent a clear abuse of such discretion. *Rippy v. State,* 550 S.W.2d 636, 638 (Tenn.1977); *State v. Hoover,* 594 S.W.2d 743 (Tenn.Cr.App.1979); *Seelbach v. State,* 572 S.W.2d 267 (Tenn.Cr.App.1978); *Adams v. State,* 563 S.W.2d 804 (Tenn.Cr.App.1978); and cases cited therein.

■ The pretrial publicity in this case has been described above and cannot possibly be compared in intensity, extent or sensationalism to that outlined in, for example, *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 725–727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); and *Adams v. State,* supra. By comparison, the coverage of this case in the Jackson media and one Memphis newspaper was a model of dignity and restraint. The affidavits submitted by defendant as exhibits to the Motion for Change of Venue, although there were many, were all alike and simply contained the conclusory statement that because of extensive publicity, Melson could not obtain a fair trial in the county.

The United States Supreme Court held in *Rideau, supra,* that, under the facts therein, it was not necessary to examine the voir dire to determine that a fair trial was impossible in the parish in question. In that case, there had been televised three times on a local station an interrogation between the sheriff and the defendant containing a detailed confession to the crimes charged

(armed robbery, kidnapping and murder). In cases such as that before us, however, it has always been held necessary to determine whether or not the jury which was actually impanelled showed bias and prejudice against the defendant. " 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. . . . ' " *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643 (citations omitted). *See Dobbert v. Florida,* 432 U.S. 282, 302, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Adams v. State, supra,* 563 S.W.2d at 806.

Several cases have adopted the words of the United States Supreme Court in *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975):

> "Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

> " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " . . ., quoting from *Irvin v. Dowd,* 366 U.S. 717, 723, 6 L.Ed.2d 751, 81 S.Ct. 1639 [1642] (1961).

*Dobbert v. Florida, supra,* 432 U.S. at 302, 97 S.Ct. at 2303; *Adams v. State, supra,* 563 S.W.2d at 807. As the Court in *Dobbert* went on to say,

> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under Murphy, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra,* [432 U.S.] at 798 [95 S.Ct. at 2035]. One who is reasonably suspected of [in *Dobbert*] murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra,* the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity.

432 U.S. at 303, 97 S.Ct. at 2303.

In *State v. Hoover, supra,* 594 S.W.2d at 746, there was listed a group of seventeen factors to be considered in determining whether to grant a change of venue. We shall relate several of these to the facts of this case in support of our holding that the trial court did not abuse its discretion in denying a change of venue to Melson. The publicity was factual, fair, and took place only through the time of the indictment. Five additional months elapsed before the trial. There was a great deal of care exercised in jury selection. Of the panel finally selected, a few knew nothing about the crime, and those who did had only heard of it at the time it happened, without paying particularly close attention. No one had formed an opinion, and all had an open mind and stated clearly that they could give Melson an impartial trial. (Even those who were peremptorily challenged, who mentioned something in passing about "seeing the criminal on television" or having heard that "she was killed by someone who had been employed by her husband," stated without hesitation that they could lay aside whatever they had heard and try the defendant fairly based only upon the evidence presented in court.) The court willingly excused for cause anyone who had, or appeared to have, formed an opinion. Melson

did not exhaust his peremptory challenges until very late in the voir dire. Although law enforcement and prosecution personnel were quoted in the press, it does not appear that anything inflammatory was said; and it appears that everyone complied with the court's June order prohibiting extrajudicial discussion of the case. The defense's affidavits in support of its motion were conclusory only, and it does not appear that there were any threats or demonstrations against Melson. Madison County is one of the more populous areas of the state, enhancing the likelihood of obtaining a jury untainted by fatal bias even if its members did have an awareness of the case.

We have no difficulty in holding that there was no error in the court's dismissal of the Motion for Change of Venue.

## JURY SELECTION

In addition to the above treatment of the voir dire process, we shall respond to three other issues raised by Melson concerning the jury selection process.

■ Melson filed a motion before trial for individual voir dire and sequestration during voir dire. The court allowed this for questions regarding the effect of publicity and the veniremen's views on the death penalty. Thus, the only portion of voir dire conducted in panels was that relating to employment, family, health, outside activities, etc. Defendant's rights were amply protected by conducting the voir dire in this manner.

Defendant also filed a motion to prevent disqualification of jurors who were opposed to the death penalty and would automatically vote against it. He argued that to exclude such jurors would violate his constitutional rights to an impartial trial and to equal protection; that persons opposed to capital punishment are an identifiable group in society and as such should be represented on the jury if the trial is to be fair.

■ We have considered the cases relied upon by Melson and hold as we did in *Houston v. State*, 593 S.W.2d 267 (Tenn. 1979) that this issue is without merit. As

we pointed out in *Houston*, not only the defendant, but also the State, is entitled to a fair and impartial trial. *Id.* at 272. "A juror who cannot follow the law and instruction of the trial judge on capital punishment is not impartial to the state. [Citations omitted.]" *Id.* A defendant's interests are quite sufficiently represented on the jury by the presence of jurors who are reluctant to impose the death penalty; such jurors essentially represent the same cross-section of society as would jurors who would automatically vote against it. Such jurors will see that it is not capriciously imposed. The function of the jury is not to make the law, but conscientiously to carry out the law as it is given to them by the court and to apply it fairly to the facts of the case.

■ Melson's third assertion is that the jury was tainted by discussion of the case in the venire waiting room. As we have noted, jury selection took over a day. At the end of the first day, tentatively selected jurors were sequestered for the night. On the second day, the first twelve tentatively selected jurors were questioned by one defense counsel as to whether anything whatsoever had happened which would in any way affect them. He questioned at length, phrasing his questions as broadly as possible. We must accept what the record reflects, and hold that the jury was not tainted up to that point.

After that, one of the first twelve was peremptorily challenged and more veniremen were called in. One was excused for cause, one was challenged, and a third became the twelfth juror. As to the alternates, two veniremen were excused for opposition to the death penalty. A third was peremptorily challenged, but her voir dire on the death penalty was uneventful. The next person became alternate juror number 1.

There followed some discussion at the bench, when defense counsel remarked that the third candidate for alternate, who had been peremptorily challenged, "attempted to tell jurors on the second floor what questions were being asked. She was asked by

the prospective jurors downstairs. I believe a Sheriff's Deputy stopped her, but there is a lot of conversation going on about the questions [and] the Court might want to question the next alternate about that." The deputy who had been present said that he had not heard that juror say anything. The court determined to ask jurors if anybody had talked to them.

Two more veniremen were excused, one peremptorily and one for cause, without being asked by the defense whether they had heard discussions about the voir dire. The next venireman was questioned about other things and the defense indicated that it was finished questioning, when the *State* asked for a bench conference. The court then asked whether, while the venireman had been waiting downstairs, anyone had discussed in his presence what was being asked in this court. The juror responded that some questions about capital punishment were being discussed. It had simply been stated that capital punishment was being asked about in the voir dire, and that "some of them said they were against it and that's why they were being relieved." Defense counsel wanted to know whether it had been discussed on the previous day or only on that day, because she had just heard a rumor that people had talked "last night" about what their answers would be. However, the venireman had only heard talk that day. The court then said to defense counsel, "Unless you have some specific incident, that closes it." Defense counsel did not object further; that venireman was excused and the court did not carry on any further voir dire.

We are of the opinion that the court in no way abused his discretion in the manner in which he dealt with this situation. The fact that capital punishment was being asked about and that people who were against it were being excused, probably came as no surprise to the jurors. We do not feel that it is so likely that jurors' answers were prejudiced that the court abused his discretion. *See State v. Groseclose,* 615 S.W.2d 142, 148 (Tenn.1981). Again, as we noted in our discussion of the change of venue argument, a defendant cannot expect to obtain a jury who has never heard of him or the case until they are actually impanelled.

## ERROR IN ADMITTING CERTAIN EVIDENCE

■ One of the issues raised by Melson is that the court erred in declaring Herbert L. MacDonnell an expert witness and admitting his testimony. However, the defense not only failed to object to the court's ruling qualifying him, but also it conducted no cross-examination of him during the qualification process. As the Court of Criminal Appeals held in *Bryant v. State,* 549 S.W.2d 956, 957 (Tenn.Cr.App.1977), "we could not consider this assignment even if it had merit."

■ What the defense did do was move after Mr. MacDonnell's direct and cross examination to strike his entire testimony "based on the last statement that he made." This was that he was not aware of the courts of Tennessee having accepted the principles on which blood stain pattern interpretation had been based, as being a recognized subject for expert testimony. The area in which Mr. MacDonnell's expert testimony was sought was basically to explain the pattern of blood stains which were spread over Melson's shirt and pants, from top to bottom, as well as to some extent on his cap and boots.

The defense's objection appears to be to the recognition of this area of expertise in Tennessee, rather than to his education, background, etc. His background and experience were formidable. He had participated in the investigations of many crimes, published many writings, conducted numerous seminars, and done research over a long period of years in forensic science in general and, in particular, the principles of physics as applied to blood patterns. He had testified in many state and federal courts, including a 1974 hearing in Memphis concerning James Earl Ray.

The defense argues that none of Mr. MacDonnell's experiments in blood pattern analysis had been carried out on humans, but only on animals. However, of course,

the crimes which he had investigated had involved humans. Further, he testified that "in physics it makes very little difference as to what the origin of the blood is—whether it is polyurethane soaked with blood or it is a human hand—it really doesn't matter. You transfer energy to blood hydrostatically and you get an eruption of blood spatters." The witness could tell the differences in the way in which blood would spatter depending upon how much force caused the blood to be shed.

The defense also urges that there is no such area of expertise as "blood stain patterns." However, although a field may be narrow, there may certainly be persons who are experts therein. Certainly there are fewer experts in, for example, nuclear physics than there are in fingerprint identification, but the narrowness of a field should not preclude the testimony of one who has proved his expertise therein to the satisfaction of the trial court in the reasonable exercise of his discretion. In any case, the witness testified that he had trained over 300 people in the area; and that there were others (including the defense's chosen expert) who were also training people. The subject has been written on as far back as 1898, and the witness knew of over a hundred reference works. As the witness said, "there are other people who testify [as blood pattern experts]. I am one of the few and I certainly wouldn't say that there are a large number, but there is an ever increasing number."

Mr. MacDonnell's testimony was clear, understandable, and accompanied by demonstrations to the jury. He obviously knew whereof he spoke, and we hold that he was clearly competent to give the testimony which he gave. Further, we repeat that the basis of defendant's objection could and should have been elicited before the witness was qualified as an expert. No error was committed.

■ Defendant complains that the court allowed the testimony of one Dora Ingram, because her name was neither endorsed on the indictment nor (according to Melson's brief) furnished to the defendant pursuant to its discovery request. The court allowed Mrs. Ingram to testify over Melson's objection because, as the State pointed out, her name had been called out numerous times during voir dire, three days earlier, as one of the State's witnesses.

We hold that the court was correct in overruling the defense's objection. The purpose of furnishing the names of witnesses is to prevent surprise, *Aldridge v. State,* 4 Tenn.Cr.App. 254, 470 S.W.2d 42 (1971); and the repeated mentioning of her name during voir dire prevented surprise when she was called. Further, her testimony contained nothing new or different which would have been damaging to Melson. She merely verified that a group of employees and their relatives was at the Shanklin house on the afternoon of the crime. Melson was not prejudiced by the admission of Mrs. Ingram's testimony. "The record contains nothing so much as intimating that [her] testimony . . . would have been otherwise if defense counsel had been able to interview and interrogate [her] before the trial." *Aldridge, supra,* 470 S.W.2d at 45.

■ As to the admission of a series of photographs of the crime scene, Melson argues that their prejudicial effect far outweighed their probative value. Generally, the law has been that "the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion," *Cagle v. State,* 507 S.W.2d 121, 132 (Tenn.Cr.App.1973). "When photographs, gruesome in nature and likely to appeal to the emotions of the jury, are not probative of some contested factual issue they are not admissible. If probative, they are. [Citation.]" *Hawkins v. State,* 555 S.W.2d 876, 878 (Tenn.Cr.App. 1977).

The leading Tennessee case on the subject is *State v. Banks,* 564 S.W.2d 947 (Tenn.1978). In that case, one Smith was brutally murdered by blows from a blunt instrument, and a strong case was made against Banks based upon circumstantial evidence. In that case, the photos had been of the victim's head and body; and Banks had argued that they were not relevant to

any contested issue, but rather had the sole purpose of prejudicing the jury. The Court of Criminal Appeals found that the admission of the photos had been, essentially, reversible error.

■ We acknowledged the rule of liberality in the admission of evidence, including photographs, placing broad discretion in the trial court. "Moreover, the trend of modern authority is to vest more discretion in the trial court in this respect." *Id.* at 949. One requirement is, of course, that the evidence be relevant to an issue in dispute. A second factor is that "even relevant evidence should not be admitted if its prejudicial effect outweighs its probative value . . . . The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* at 951.

■ Melson argues that the photographs admitted here were not probative of a disputed issue, because he does not dispute the cause of Mrs. Lawrence's death. Thus, their prejudicial effect as a matter of law outweighs their probative value. He argues that the testimony of, for example, the pathologist and the coroner "adequately established and better explained" the cause of death.

The State has made the arguments that the photos did have probative value because the amount of blood and the conditions at the scene showed premeditation and deliberation; further, because the defense challenged on cross-examination the conclusion reached by the officers at the scene that the substance all over the room was blood; and further because the photos tied in with the testimony of Mr. MacDonnell as to how the blood got where it did (i.e., on the surfaces all around the room and on Melson's clothing). Of course, the admission of the photographs was discussed outside the presence of the jury; and the State indicated that it had other, more gruesome, pictures which it was not seeking to have placed into evidence.

Thus, the fact and cause of death were not the issues on which the State sought to have these photographs admitted. We agree with the trial court that their admission was justified as relevant to the issues relied on by the State, and hold that there is no showing that the court abused his discretion in admitting them. Additionally, it certainly does not affirmatively appear that the "admission of the photographs has affected the results of the trial." *Banks, supra,* at 953. *See also, United States v. Brady,* 595 F.2d 359, 361 (6th Cir. 1979).

■ Two FBI Special Agents were allowed to testify, one as to his analysis of Melson's clothing and other items for blood thereon; and one as to his comparisons of hair samples found on the evidence with known hair samples taken from Melson and the victim. The substance of their testimony is related elsewhere in this opinion; here, we deal with Melson's contention that their testimony was too speculative to be admissible; that the prejudicial effect outweighed the probative value. Although he concedes that the two witnesses were experts, he asserts that there are three additional "prongs" of a test for admissibility of expert testimony, outlined in *United States v. Brady, supra,* following *United States v. Brown,* 557 F.2d 541 (6th Cir. 1977), which were not met here. These three are: proper subject, conformity to a generally accepted explanatory theory, and probative value compared to prejudicial effect.

As to the blood samples, particularly on Melson's clothes and the ball peen hammer, the testimony was highly relevant. Although no stain was large enough to test for blood type, the presence of human blood and the absence of hog blood were positively established. This disproved Melson's explanation given at the time of his arrest for the presence of blood on his clothing—that he had been giving shots to hogs. Also, if the blood had come from such source, there would be no reason for it to appear on the ball peen hammer found in his truck.

As to the hair samples, the witness described how hair samples are compared and the twenty or so characteristics of each hair which are examined. It is true that two individuals may possibly have matching

hair, unlike fingerprints, which are unique. The agent stated that in a Canadian study, and in his own experience, it had been found that the hair of two different people would match in one out of every 4,500 to 5,000 cases. Further, the other individual would have to have been in the same place at the same time as the individual being examined. Thus, it was extremely unlikely that a hair, found on Mrs. Lawrence's blouse and exactly matching Melson's hair, would have come from someone else's head. It was also highly unlikely that the hair embedded in blood on the ball peen hammer, which exactly matched Mrs. Lawrence's hair, would have come from anyone else. This likelihood was rendered even more remote by the fact that the hair on the hammer was broken off rather than having been pulled out of having fallen out, and thus could only have come out by the application of force.

We have no hesitation in holding that the testimony of the FBI agents clearly met all tests for admissibility. This holding is fully consistent with the holding in defendant's own case, *Brady, supra.*

## TRIAL COURT'S REFUSAL TO GIVE REQUESTED INSTRUCTIONS IN SENTENCING PHASE

Before the sentencing phase of the trial, Melson's counsel requested five special instructions, which the court declined to give. Counsel did not object or except to this ruling, but asked that the request be included in the record, which implies an objection. The requested instructions, and our holding as to each, follows:

■ 1 and 2. That the decision to afford an individual defendant mercy does not violate the Constitution. That in setting the punishment, the jury was to weigh the evidence in aggravation and mitigation, but was not to be influenced by passion, prejudice, or other arbitrary factor. Counsel cited *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

These were basically observations made by the Supreme Court in the course of the *Gregg* opinion, and do not explain or eluci-

date the Tennessee death penalty statute, TCA § 39–2404. The Court of Criminal Appeals well explained why observations contained in appellate court opinions do not form a satisfactory basis for jury instructions in *Henderson v. State,* 539 S.W.2d 843, 847–849 (Tenn.Cr.App.1976). Also, the idea that "mercy" could be extended to a defendant is incorporated in the instructions on mitigating factors; and the admonition against being ruled by passion or prejudice runs throughout. Thus, these requested instructions were reflected in the instructions actually given. *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976).

■ 3 and 4. That the jury need not find any mitigating circumstance in order to return a life sentence; a life sentence may be returned regardless of the evidence. That in order to impose a death sentence, the jury must be unanimous; if the jury could not reach a unanimous decision, defendant would be sentenced to life imprisonment.

■ These requested instructions simply are not correct statements of the law. If no *aggravating* circumstance is proved by the State beyond a reasonable doubt, then the jury must return a life sentence without having to consider mitigating circumstances. However, if the State does prove an aggravating circumstance beyond a reasonable doubt, then unless the jury finds that mitigation exists and outweighs the aggravating circumstance, it can only impose the death penalty.

As to the unanimity prong, TCA § 39–2404 is clear that any *jury*-imposed punishment must be unanimously reached. Thus, when the jury is considering its choices of punishment, it is only concerned with reaching a unanimous result, just as is any jury in the guilt or liability phase of a trial. This point was considered in *Houston v. State,* 593 S.W.2d 267 (Tenn.1979), wherein we held, "The after-effect of a jury's deliberation is not a proper consideration for the jury." *Id.* at 278.

5. That in its deliberations, the jury was to presume that if it imposed a life sentence, Melson would spend the rest of his life in prison, and if it imposed a death sentence, Melson would be electrocuted; and the jury was to make no other presumption.

Again, this is not a full and fair reflection of what the jury was to consider; and dealt more with the effects of the verdict than with the verdict itself, *Houston, supra.* The law was correctly given to the jury in the court's charge, *Edwards, supra.*

## CONSTITUTIONALITY OF DEATH PENALTY STATUTE

In addition to the above challenges to the trial court's refusal to give requested jury instructions, Melson challenges the constitutionality of the Tennessee death penalty statute, TCA § 39–2404. Most of the grounds advanced by Melson have been examined previously by this Court and found to be without merit.

He argues that one aggravating circumstance found by the jury (§ 39–2404(i)(5), the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind), is unconstitutionally vague and overbroad, a contention which we have rejected in *State v. Pritchett,* 621 S.W.2d 127 (Tenn.1981); *State v. Strouth,* 620 S.W.2d 467 (Tenn.1981); *State v. Groseclose,* 615 S.W.2d 142 (Tenn.1981); and *State v. Dicks,* 615 S.W.2d 126 (Tenn. 1981). In *Strouth,* we stated that this aggravating circumstance should be interpreted to refer to a conscienceless or pitiless act which was unnecessarily torturous or evinced a depraved state of mind; that the torture inflicted must be heinous, atrocious or cruel. We agree that the killing of Barbara Lawrence met this test, despite Melson's argument that no torture occurred because Mrs. Lawrence died immediately. This theory is not plausible. First, the uncontradicted proof shows that Mrs. Lawrence had defensive injuries to her arms and hands, proving that there was time for her to realize what was happening, to feel fear, and to try to protect herself. Second, a killing wherein the victim is struck up to thirty times, causing an entire room to be covered with a spray of flying blood, and causing the victim's brains to extrude through the gaping hole in her skull, evinces depravity of mind.

He argues that the second aggravating circumstance found (§ 39–2404(i)(6), prevention of arrest or prosecution, does not apply to him. We find that the jury could have found that this factor was present beyond a reasonable doubt, since Mrs. Lawrence had threatened to expose his alleged theft of gasoline. He had told Henry Shanklin, "I'm in a heap of trouble;" and he had told Mattie Lewis, "She can't tell Mr. Jack and have Mr. Jack coming back there raising hell with him."

Defendant argues that the death penalty is a disproportionately severe punishment, considering the crime and the defendant. Counsel compare this case with several others they urge prove their point. However, comparing this case with numerous others illustrates that imposition of the death penalty does not demonstrate that the jury was aberrant, arbitrary or capricious. Nor can we agree with Melson that the sentencing review process established under TCA § 39–2406 and Rule 12 (formerly Rule 47) of this Court is unconstitutionally inadequate to afford a meaningful proportionality review. *State v. Pritchett, supra; State v. Strouth, supra; State v. Coleman,* 619 S.W.2d 112 (Tenn.1981); *State v. Groseclose, supra.*

We have held that it is constitutional under TCA § 39–2404(h) not to inform the jury that if they fail to agree unanimously on punishment, the trial court will impose a life sentence. *State v. Simon,* 635 S.W.2d 498 (Tenn.1982); *State v. Harrington,* 627 S.W.2d 345 (Tenn.1981); *State v. Pritchett, supra; State v. Strouth, supra; Houston v. State,* 593 S.W.2d 267 (Tenn.1979).

The presence of the exclusive list of possible aggravating circumstances set out in TCA § 39–2404(h) is adequate notice thereof to a defendant, without his being specifically notified by the State of the

**368**

particular ones upon which it is relying. *State v. Strouth, supra; State v. Groseclose, supra; State v. Berry,* 592 S.W.2d 553 (Tenn.1980).

Melson's argument that the statute, TCA § 39–2404(f) and (g), fails to specify the burden of proof and standard of proof to be used in determining whether aggravating circumstances outweigh mitigating circumstances has previously been addressed, *State v. Johnson,* 632 S.W.2d 542 (Tenn. 1982); *State v. Coleman, supra; State v. Pritchett, supra; State v. Dicks, supra; State v. Houston, supra.*

■ Melson argues that TCA § 39–2404(j) is unconstitutional in failing to require the jury to specify what mitigating circumstances have been considered and found to be absent and insufficient to outweigh the aggravating circumstances (which must have been found beyond a reasonable doubt to exist before the jury reaches the issue of mitigating circumstances). He argues that this shortcoming prevents adequate review by this Court under TCA § 39–2406(c)(3). We disagree.

The weighing of aggravation/mitigation by the jury is fraught with safeguards for a defendant. There are only certain aggravating circumstances which may be considered. These are spelled out in the statute and the jury is instructed that it may not consider any other factors. The State has the burden of proving *beyond a reasonable doubt* that one or more factors exist.

The statute lists mitigating circumstances which may be considered; but, in contrast to the list of aggravating circumstances, the jury is in no way limited to these factors. It may consider any other factors on its own initiative, and in fact the court in this case added several others in its instructions: Melson's honorable discharge from the Navy, his lack of significant history of prior criminal activity, and that he was a family man who was a peaceful and productive member of the community. There is no burden of proof as to mitigating factors; and the jury may find that any factor outweighs any aggravating circumstance. That is, the jury may attach great weight

or significance to any factor; it has a great deal of latitude. If a jury finds that aggravating circumstances are outweighed, there is nothing which the State can do to change this outcome, while an opposite finding is reviewable by this Court. Defendants may be assured that this Court will carry out the statutory requirement of TCA § 39–2406(c)(3) that "in reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether ... the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance or circumstances so found."

■ Melson's last point is that TCA § 39–2404(d) denies him the right to present "final argument" to the jury at the sentencing phase. The statute provides for closing argument first by the State, then by the defendant, and last by the State. This is the same order of argument which exists in any proceeding, with the party having the burden of proof arguing first and last. Thus, this order is not inherently prejudicial to the defendant or favorable to the State in its use at the sentencing stage of a death penalty proceeding. None of the cases cited by defendant holds, or even implies, otherwise. In *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), the Supreme Court overturned a conviction which had taken place without a jury trial. The trial judge had exercised discretion allowed him under a New York statute and had disallowed *any* summation of the evidence on the part of the defendant. Such case is inapposite here. We hold that this issue is without merit.

■ We hold that the Tennessee death penalty statute is constitutional; and upon our review under TCA § 39–2406, we hold that it was not applied arbitrarily, capriciously or with passion in this case.

The trial court's rulings on all issues raised herein, the verdict of the jury, and the imposition of the death penalty, are all affirmed. The date of execution is fixed for November 15, 1982, unless stayed or

otherwise ordered by this Court or other proper authority. Costs are assessed to appellant.

HARBISON, C. J., and FONES and COOPER, JJ., concur.

BROCK, J., dissents in part and concurs in part.

BROCK, Justice, concurring in part and dissenting in part.

For the reasons stated in my dissent in *State v. Dicks,* Tenn., 615 S.W.2d 126 (1981), I would hold that the death penalty is unconstitutional; but, I concur in all other respects.