IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2003 Session

## STATE OF TENNESSEE v. ALBERT D. WILSON, II

**Direct Appeal from the Circuit Court for Blount County**
**No. C-10843     D. Kelly Thomas, Jr., Judge**

_____

**No. E2002-00890-CCA-R3-CD**
**September 9, 2003**
_____

The appellant, Albert D. Wilson, II, pled guilty in the Blount County Circuit Court to possession of a Schedule II controlled substance and was sentenced to eight years incarceration in the Tennessee Department of Correction. The appellant reserved two certified questions of law relating to the propriety of the search of his motel room. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Robert W. White (on appeal) and Charles Deas (at trial), Maryville, Tennessee, for the appellant, Albert D. Wilson, II.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Mike Flynn, District Attorney General; and John Bobo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On June 14, 1999, and July 8-9, 1999, a hearing was held in the Blount County Circuit Court on the appellant's motion to suppress evidence discovered as the result of a search of his motel room. The first witness at the suppression hearing was Ron Talbott, a Blount County Sheriff's Department officer who was assigned to the Fifth Judicial District Drug Task Force. Agent Talbott testified that on July 18, 1997, he received a telephone call from Major Ron Dunn of the Blount County Sheriff's Department. Major Dunn informed Agent Talbott that an anonymous caller had informed him that "there was a subject by the name of 'Don' at the Ramada Inn on Alcoa Highway, staying in Room

606, that was selling and using crack cocaine and cocaine." The anonymous caller also stated that there was a tan minivan parked outside the room.

Agent Talbott, Agent Scott Johnson, and Agent Derrick Swenson went to the Ramada Inn on Alcoa Highway to "follow up on that complaint" by performing a "knock-and-talk."[1] When the agents approached room 606, Agent Talbott noticed a tan minivan parked outside the room. Agent Talbott knocked on the door of room 606 and "[a] gentleman came to the door as we knocked on the door." The man, later identified as David Simerly, did not offer his name at that time and the agents did not see anyone else in the room. Agent Talbott identified himself and the other agents and told Simerly "that we had received complaints of sales of illegal narcotics and the use of drugs coming from this room, 606. I told him we'd like to come in and speak with him about it and follow up on the complaint." Simerly responded, "Yeah, come on in." Agent Talbott testified that Simerly did not object to the agents' entry; in fact, Simerly was very cooperative and friendly.

Accordingly, the three agents entered room 606. Agent Talbott noticed that there was "quite a bit of clothing in the room." Almost immediately after the agents' entry, a man later identified as the appellant emerged from the bathroom with a towel wrapped around himself. Agent Talbott again identified himself and the other agents and explained why they were in the room. The appellant asked if he could quickly finish his shower and Agent Talbott agreed to this request. The appellant did not ask the officers to leave the room.

While the appellant was showering, the agents had a brief conversation with Simerly. During the conversation, Agent Talbott noticed "drug paraphernalia in two different areas of the room." Agent Talbott testified that he observed "[i]tems used to commonly smoke cocaine with. Light bulbs that had the tips busted out of them. By light bulbs, I mean like a car light bulb and with straws taped and attached to the back parts of the bulbs. And butane torches and that type of thing." Agent Talbott stated:

> I didn't move anything. One was just right at the – right behind me.
> Like I say, I was standing at the foot of the bed where the – between
> the bed and where the TV sets on the desk – or the dresser or
> whatever you might want to call it – and it was laying right beside of
> it. The other was laying on the table underneath the light that drops
> from the ceiling next to the door.

Shortly thereafter, the appellant emerged from the shower and the agents learned his identity. The agents again explained why they were there. Agent Talbott also informed the appellant that he had noticed drug paraphernalia in the room while the appellant finished his shower. The appellant stated that he was aware that the drug paraphernalia was in the room. Agent Talbott requested consent to search the room, but the appellant refused to give consent.

---

[1] Agent Talbott explained that a "knock-and-talk is simply nothing more than to investigate a complaint. . . . We knocked and once we got an answer, we started talking. And that's just what it's referred to."

Following the appellant's refusal, Officer Joe Thornhill and Officer David Carswell of the Alcoa Police Department were called to room 606. They "secur[ed] the room and protect[ed] it as a crime scene" while Agent Talbott left to obtain a search warrant for the room. Agent Talbott estimated that approximately two hours elapsed from the time of the anonymous telephone call to the signing of the search warrant.

Upon Agent Talbott's return to room 606, he encountered the appellant's attorney, Jeff Whitt, and one of Whitt's associates. Agent Talbott learned that the appellant had called Whitt while Agent Talbott was obtaining the search warrant. Whitt asked the agents to leave. Agent Talbott gave Whitt a copy of the search warrant and told Whitt that "I had a search warrant and a crime scene to search and that I would leave when my investigation was complete."

During the search of the room, the agents discovered various items used to smoke narcotics, a book about cocaine, approximately $3000, approximately seven or eight grams of methamphetamine, 128 grams of cocaine, some marijuana, and a loaded nine-millimeter handgun. A large amount of the cocaine was individually packaged for resale. The contraband was found underneath the mattress on one of the two beds in the room and in a black leather bag located in the bathroom.

Agent Talbott acknowledged that prior to the officers' entry into room 606, he did not determine who had rented the room. Agent Talbott also maintained that after knocking on the door of room 606, he did not instruct Simerly to sit on the bed. Agent Talbott stated that "as far as I knew, it was his place of residency." Furthermore, Agent Talbott related that "I don't know if [Simerly] was staying there or he hadn't been staying there as long as Don Wilson [the appellant] had been or if he was just visiting or – seems like he had some clothes there but, like I say, I don't really remember."

Agent Scott Johnson testified that on July 18, 1997, he accompanied Agent Talbott and Agent Swenson to room 606 of the Ramada Inn on Alcoa Highway to investigate a complaint. Agent Talbott knocked on the door of room 606 and the door was opened almost immediately by Simerly. Agent Johnson stated that Agent Talbott did most of the talking during the encounter. After identifying himself and the other agents, Agent Talbott explained that they were there to investigate a complaint regarding the sale and use of narcotics in room 606. Agent Talbott then asked Simerly for permission to enter the room. Simerly responded, "Yeah, come on in."

Shortly after the agents entered the room, the appellant came out of the bathroom. The officers again identified themselves and explained their reason for being in the room. The appellant asked for permission to finish his shower, which permission was granted. The appellant did not ask the agents to leave. While the appellant showered, the agents talked with Simerly and Agent Johnson noticed a "crack pipe" located "in plain view on a table right there next to the doorway." Agent Johnson testified that when the appellant came out of the bathroom, "there was a little more discussion . . . about why we were there. We told him that we had seen the crack pipe." The

appellant acknowledged that he knew the device was there. The officers then requested permission to search the room, but the appellant refused to consent.

Agent Johnson stayed in room 606 with two Alcoa officers while Agent Talbott and Agent Swenson left to obtain a search warrant for the room. During the wait, the appellant asked Agent Johnson if he could make a telephone call. Agent Johnson gave the appellant permission to do so and the appellant called his attorney, Whitt. After speaking with Whitt, the appellant asked the officers to leave the room. However, the officers refused to leave and soon thereafter, Whitt and an associate arrived at the room.

Agent Johnson noted that during the wait for the search warrant, Simerly, who appeared to be intoxicated, fell asleep on one of the beds in the room. When Simerly roused, he asked Agent Johnson if he could get a beer out of the cooler in the room. Agent Johnson responded that Simerly had already had enough to drink. Simerly then became uncooperative and eventually Agent Johnson raised his voice and told Simerly to sit down and cooperate. Simerly complied.

John David Simerly testified that he and the appellant were friends and that on July 18, 1997, he was visiting the appellant at the Ramada Inn on Alcoa Highway in order to use the motel pool. Simerly estimated that he had been in the appellant's room for a few hours when he heard a knock on the door. Simerly told the appellant, who was in the shower, that someone was at the door. The appellant instructed Simerly to determine who was at the door but not to allow anyone in the room. Simerly asserted that the appellant never gave permission for anyone to enter the room.

Simerly stated that upon hearing another knock, he "cracked the door" in order to see who was there. Simerly asserted that "[t]here was a badge put in my face, 'Blount County Metro Narcotics, take a seat on the bed.'" The officers asked if "Don Wilson" was in the room, and Simerly told them that the appellant was in the shower. The officers then entered the bathroom to speak with the appellant.

The agents asked the appellant for permission to search the room, but the appellant refused the request. Simerly asserted that he did not see the pipe found by the officers. Simerly stated that he was upset and "didn't know what was going on."

The appellant testified that he was the only guest registered to room 606 of the Ramada Inn on Alcoa Highway on July 18, 1997, and that on the date of the search, he had been living at the motel for approximately four to six weeks. The appellant stated that Simerly was merely visiting room 606 that day; he was not an overnight guest and had no clothes in the room. Moreover, the appellant asserted that Simerly did not have the authority to allow anyone to enter the room.

The appellant stated that while he was in the shower, he heard a knock on the door of the motel room. The appellant instructed Simerly to determine who was at the door, but he instructed Simerly not to allow anyone to enter the room. The appellant stated:

-4-

> I remembered that I had a bag sitting in the middle of the floor in the
> main part of the room. I hollered at [Simerly], I said, wait a minute.
> I got out, grabbed a towel, wrapped it around me, walked in there –
> run in there, got it and run back in the bathroom.

The appellant closed the bathroom door and continued his shower. The appellant testified that shortly thereafter, he opened the shower curtain and saw Agent Johnson standing in the bathroom. The appellant asked Agent Johnson to identify himself. In response, Agent Johnson asked the appellant, "Are you Don?" When the appellant replied in the affirmative, Agent Johnson identified himself and explained that he was an officer with Metro Narcotics. The appellant wrapped a towel around himself and went into the bedroom. The appellant averred that he never got back into the shower.

Agent Talbott informed the appellant that the agents wanted to search the room because of an anonymous tip. The appellant refused to consent to the search of his room. According to the appellant, Agent Talbott "turned to the other officer which was standing in the doorway and told him to . . . 'Get on the horn and find us a judge.'"

The appellant admitted that a pipe used to smoke methamphetamine was in the room, but he claimed that the pipe was "underneath the table, laying on top of the air conditioner." The appellant stated that the pipe was not in plain view, explaining "[y]ou'd have to be on the – walk around the table and be on the back side of the table in order to see it, and then you'd have to squat to see it." Furthermore, the appellant asserted that any butane torches in the room were stored in a box and were not in plain view.

The appellant stated that while the search warrant was being obtained, he asked Agent Johnson if he could use the telephone. Agent Johnson told the appellant that he could use the telephone and the appellant called Whitt. Whitt instructed the appellant to tell the officers to leave the room. The appellant did so, but the officers refused to leave. Whitt asked to speak with Agent Johnson on the telephone. The appellant stated that Agent Talbott stayed in the corner of the room the entire time. When Whitt arrived, he asked the officers to leave. The officers again refused to leave and subsequently produced the pipe, stating that they were securing the room while waiting for a search warrant.

Finally, Jeff Whitt testified that the appellant called him on July 18, 1997, and informed him that the officers were in the appellant's motel room. Whitt told the appellant to order the officers to leave the room. After the officers refused to comply, Whitt spoke with Agent Johnson on the telephone. Whitt and William Brown, another attorney from Whitt's office, went to room 606 at the Ramada Inn on Alcoa Highway. Whitt could not recall if Agent Talbott was at the room when he arrived. Whitt, acting as the appellant's attorney, asked the officers to leave. The officers again refused and explained that they were waiting on a search warrant. Whitt maintained that either Agent Johnson or Agent Talbott showed him the pipe that was found in the room, stating "we could just arrest him for this."

At the conclusion of the hearing, the trial court overruled the appellant's motion to suppress the evidence obtained during a search of the appellant's motel room. Thereafter, the appellant pled guilty to the possession of a schedule II controlled substance with the intent to sell or deliver, a class B felony. The appellant was sentenced to eight years, "split confinement of 11/29 day for day, 1 year intensive prob[ation], 2 years supervised prob[ation], balance on unsupervised prob[ation]." The appellant properly reserved the following certified questions of law:

> I. Whether officers of the Blount County Sheriff's Office Fifth Judicial District Drug Task Force had valid consent to enter the hotel room of the [appellant] on July 18, 1997 pursuant to the IV Amendment to the U.S. Constitution & Article I, Sect. 7 of the TN Constitution, where a quantity of Schedule II narcotics were subsequently discovered[; and]

> II. Whether there was probable cause for the issuance of the search warrant secured by Ron Talbott of the Blount County Sheriff's Office Fifth Judicial District Drug Task Force on July 18, 1997 for a search of the [appellant's] hotel room pursuant to the Fourth Amendment to the U.S. Constitution and Article I, § 7 of the Tennessee Constitution.

## II. Analysis

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

### A. Consent

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). The same protection enjoyed by a citizen in his home is extended to a citizen in a "hotel room[] and other temporary living spaces." State v. Ross, 49 S.W.3d 833, 840 (Tenn. 2001).

Our supreme court has noted that, "[i]t is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d

227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-2044 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. The prosecution bears the burden of proving that the appellant freely and voluntarily gave consent. See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). We further observe that "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386).

Generally, consent may be given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." State v. Ellis, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citations omitted). The United States Supreme Court has defined common authority as the

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

United States v. Matlock, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1974); see also Bartram, 925 S.W.2d at 231. However, this court has previously explained that

> [t]he State may satisfy its burden of proof in this regard either by demonstrating that the third party in fact possessed common authority as defined above or, alternatively, by demonstrating that the facts available to the searching police officers would have warranted "'"a man of reasonable caution in the belief"'" that the consenting party had authority over the premises."

Ellis, 89 S.W.3d at 593 (quoting Illinois v. Rodriguez, 497 U.S. 177, 188-89, 110 S. Ct. 2793, 2801 (1990)). Notably, the United States Supreme Court has opined that the

> Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

Rodriguez, 497 U.S. at 186, 110 S. Ct. at 2800.

In the instant case, the three drug task force agents went to room 606 to perform a "knock-and-talk." See State v. Boyd L. Jones, No. W2002-00827-CCA-R3-CD, 2003 WL 1618069, at *4 (Tenn. Crim. App. at Jackson, Mar. 26, 2003). Agent Talbott knocked on the door of room 606 and a man later identified as Simerly opened the door. The agents could see into the motel room behind Simerly, but they did not notice anyone else in the room. Agent Talbott identified himself and the other agents and advised Simerly that they worked for the drug task force. Agent Talbott explained that the agents were at the room to investigate a complaint regarding the use and sale of drugs from room 606; accordingly, Agent Talbott asked for permission to enter the room. Simerly allowed the agents to enter the room.

There was no proof adduced at the suppression hearing to suggest that Simerly had "common authority," as defined in Matlock, over the motel room. However, the evidence did show that the agents reasonably believed that Simerly was a resident of the premises with the requisite authority to grant the agents entry. Significantly, at the conclusion of the suppression hearing the trial court found:

> Here, I've judged the credibility by the testimony and the appearance and the demeanor of the witnesses that I've seen testify. And I do not find the testimony given by Mr. Simerly about how the officers came into the room to be credible. Based on his actions on the stand, based on his actions at the scene, based on him – I think Mr. Simerly was under the influence and went to the door and saw these men at the door and he opened the door and they said can we come in and he said, sure, come on in. And there's no reason that the officers shouldn't enter at this point.

> The next issue is, since they were in the room by permission, they could have been ejected by direction of Mr. Simerly or Mr. Wilson at any time, unless they had something – something had happened in the meantime that gave them the right to stay there over somebody's objection. And I think the proof has shown that that did happen. And that is, that they saw something that was obviously used to smoke some sort of controlled substance and a lighter or torch of some sort laying in plain view when they came into the room. And that was evidence of a crime. And from that point on, they didn't have to leave when they were told to leave.

> They could have made an arrest based on probable cause at that point, and done a walk-through. That would have revealed the bag that had the gun in it and maybe some more paraphernalia. It wouldn't have given them the right to search to the extent that they did with the search warrant – that is, between the mattresses and things like that. There would have been no justification, obviously, for looking for

somebody hiding under a mattress or anything like that. But they didn't do that. They just stayed there and got the warrant and then searched.

We conclude that the evidence does not preponderate against the trial court's findings. The officers, acting under a reasonable belief that Simerly was a resident of the premises, asked Simerly for permission to enter the motel room and Simerly gave the agents permission to enter. Therefore, the officers could have reasonably determined that Simerly had the authority to give consent to the officers to enter the room.

## B. Search Warrant

The appellant also raised the issue of whether there was probable cause for the issuance of the search warrant for the appellant's motel room. Our supreme court has explained that

> [t]he Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause.

State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998) (footnote and citations omitted). "A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999).

Moreover, "a finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit." Henning, 975 S.W.2d at 294. Specifically, this court has observed that "[p]robable cause to support the issuance of a warrant must appear in the affidavit, and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." State v. Barbara Copeland, No. 03C01-9402-CR-00079, 1996 WL 368209, at *3 (Tenn. Crim. App. at Knoxville, June 28, 1996); see also State v. Moon, 841 S.W.2d 336, 337-38 (Tenn. Crim. App. 1992). Additionally, "[i]n order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that the contraband will be found in the place to be searched pursuant to the warrant." State v. Norris, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000). Furthermore, "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." State v. Bryan, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)). Accordingly, we must review the affidavit to determine whether there was sufficient evidence contained therein to support the issuance of the search warrant.

In the affidavit supporting the search warrant, Agent Talbott explained that the agents went to room 606 to investigate the anonymous complaint of drug use and sales.  After knocking on the door and receiving consent, the agents entered the room.  Once legitimately in the room, the agents observed two "crack pipe[s]" in plain view.  In the affidavit, Agent Talbott stated that he is "familiar with what drug paraphernalia looks like and how it is used."  Thus, based solely upon the agents' observation of drug paraphernalia used to smoke narcotics, a magistrate could reasonably determine that narcotics were in the room.  Accordingly, we conclude that the search warrant permitting the search of the appellant's motel room was valid.

### III.  Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE