IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 17, 2004

## STATE OF TENNESSEE v. BRADLEY LONSINGER

**Appeal from the Circuit Court for Warren County**
**No. F-8825     Larry B. Stanley, Jr., Judge**

———————————

**No. M2003-03101-CCA-R3-CD - Filed January 5, 2005**

———————————

The defendant, Bradley Lonsinger, was convicted of attempt to manufacture a Schedule II controlled substance, methamphetamine, a Class D felony, and was sentenced as a Range II, multiple offender to eight years in the Tennessee Department of Correction and fined $5000. He raises two issues on appeal: (1) whether the search warrant leading to his arrest was based on sufficient probable cause; and (2) whether the evidence was sufficient to support his conviction. Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. JOSEPH M. TIPTON, J., concurred in the result.

Robert S. Peters, Winchester, Tennessee, for the appellant, Bradley Lonsinger.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On August 24, 2001, Warren County Sheriff's Deputies Chad Martin and James Ramsey went to the defendant's residence to serve an arrest warrant, and Martin smelled a strong chemical odor emanating from the mobile home. After about thirty minutes, the defendant answered the door. Deputy Martin asked the defendant to accompany him to the sheriff's department, and they both stepped back inside the trailer in order for the defendant to put on some shoes. Inside the trailer, Deputy Martin smelled a strong odor associated with the manufacture of methamphetamine and a similar odor on the defendant's clothing. Based on his observations made while serving the arrest warrant, Deputy Martin obtained a search warrant of the defendant's home, which he and other

deputies executed a few hours later. Inside and near the defendant's residence, the deputies found and confiscated thirty-seven items associated with the manufacture of methamphetamine.

On November 9, 2001, the Warren County Grand Jury charged the defendant in a one-count indictment with attempt to manufacture methamphetamine. Thereafter, the defendant filed a motion to suppress the evidence obtained as a result of the search of his house, which the trial court denied, finding that Deputy Martin's affidavit set forth sufficient probable cause to support the search warrant.

At trial, Deputy Martin testified that he had attended a week-long school in Chattanooga conducted by the Drug Enforcement Administration (D.E.A.) and the Southeastern Tennessee Drug Task Force, was certified in clandestine drug laboratories, and had "been to numerous schools put on by the National Guard Counter Drug, D.E.A., and other meth task force schools." He also had investigated methamphetamine laboratories through his work at the sheriff's department. He testified there is a distinctive odor associated with methamphetamine labs, a "real strong chemical odor," which can only be described as smelling "like a meth lab because there is nothing else that smells that way." When he went to the defendant's home to serve "a paper," he knocked loudly and continuously on the door in an attempt to summon the defendant to the door. After about thirty minutes, during which time the deputy "could hear movement in the trailer," the defendant answered the door at the prompting of his father who had arrived on the scene. Also, he could smell an odor coming from the trailer such as he had "smelled in previous methamphetamine labs." Deputy Martin asked the defendant to accompany him to the sheriff's department and stepped inside with the defendant while the defendant retrieved his shoes. He observed a person sitting near the living room in the somewhat darkened trailer. Although he did not observe anything incriminating in "plain view," the deputy said the "smell was so strong that [his] eyes start[ed] watering inside the trailer." He testified further about the overpowering chemical odor inside the trailer:

> Q      Tell us about the odor that you noted.
>
> A      It was a strong chemical odor that I associate with the manufacture of methamphetamine. My eyes were burning. You know, I had a strong taste. It was in the air real strong.
>
> Q      Okay. Have you had that experience in the past when you have worked methamphetamine labs in terms of your eyes watering and your throat getting dry?
>
> A      Yes sir.
>
> Q      All right. Are there other symptoms that you develop when you are in the presence of this odor of methamphetamine?

A       Other than, you know, coughing. It kind of takes your breath. You have burning and watery eyes. That is the way it usually affects me.

Based on his observations in the defendant's trailer, Deputy Martin obtained a search warrant and returned a few hours later with Deputy Ramsey and Deputy Chism and searched the defendant's home. At that time, there were three other adults and a child in the home who were detained during the search. Deputy Martin testified as to the items shown in the photographs taken during the execution of the warrant and as to their location in the trailer, as well as how they were used in the manufacture of methamphetamine. In bedroom and dining room closets throughout the house, as well as under the couch and kitchen sink, the deputies found lye, tubing, aluminum foil, non-flammable brake cleaner, stained coffee filters, acetone, matches, red phosphorus, glass pipes with methamphetamine residue, iodine, peroxide, rubber gloves, Coleman fuel, a bowl with brownish red stains, jars with crystalized substances, and empty bottles used as HCL generators.[1] Two of these HCL generators still had smoke coming from holes in the tops. Based on all of this, Deputy Martin believed that methamphetamine was being produced at the defendant's residence. On cross-examination, Deputy Martin testified that, although the odor he described in the affidavit was "[s]imilar to battery acid," he did not find any battery acid in the defendant's trailer and said that he believed the odor was produced by "a mixture of all of the items found" and that "[e]very methamphetamine lab that I have ever been to has that smell." He acknowledged that they did not find any ephedrine or pseudoephedrine, which is an essential ingredient in the manufacture of methamphetamine.

Deputy Ramsey testified that he had attended various in-service training classes dealing with methamphetamine labs, as well as classes conducted by the Kansas Bureau of Investigation. As a deputy, he had been present at methamphetamine crime scenes and had become familiar with materials and ingredients used in the manufacture of methamphetamine. While waiting for the defendant to answer the door, Ramsey "smell[ed] a strong odor that was consistent with the manufacturing of methamphetamine" and "hear[d] movement inside the residence." When he returned to execute the search warrant, he smelled an odor which made him cough and gave him a headache. In his opinion, based on the "totality of the evidence that was found at the scene, and the smells that were at the scene," the "manufacturing of methamphetamine was at one point taking place." On cross-examination, he testified that the odor coming from the defendant's residence was like no other, that it "had its[] own smell, that if [sic] making methamphetamine."

The defendant did not testify or present any proof.

---

[1]Deputy Martin testified that these were used to mix either muriatic acid and aluminum foil or sulfuric acid and rock salt to produce hydrogen chloride gas, which is then used to "gas the finished product." He referred to them at trial as "HCO" and "HCL" generators, while his evidence log noted them as "HCL" generators.

## ANALYSIS

## I. Probable Cause

The defendant contends on appeal that Deputy Martin's affidavit in support of the search warrant for his property was insufficient to establish probable cause, arguing the fact that the deputy smelled an odor was not sufficient, by itself, to support a reasonable ground of suspicion on the part of Deputy Martin that there would be any drug evidence in the defendant's residence.

We begin our analysis by noting that since the record on appeal does not contain a copy of the motion to suppress, we do not know what claims the defendant made as to the alleged deficiencies in the search warrant. Additionally, while copies of what presumably are the search warrant and supporting affidavit are included in the "technical record," it does not reflect how they came to be in that record. The record on appeal does not contain a transcript of the hearing on the motion, where the search warrant might have been made an exhibit, and the trial transcript shows that it was not made an exhibit at the trial. Therefore, we conclude that a copy of the search warrant is not properly in the record and, thus, not properly before this court. Thus, the situation is like that in State v. Cooper, 736 S.W.2d 125 (Tenn. Crim. App. 1987), where we declined to review a denial of a motion to suppress when the search warrant and the affidavit were not properly in the evidence:

> Unfortunately, we are unable to resolve this issue on the merits because the search warrant and the affidavit given in support of the search warrant were never introduced into evidence. However, they have been included in what was formerly referred to as the "technical record." An examination of the documents reveals no indicia that they were made an exhibit at the suppression hearing or the trial; and they have not been authenticated by the trial judge.
>
> Before an exhibit may be considered by this Court, it must have been (a) received into evidence, (b) marked by the trial judge, clerk or court reporter as having been received into evidence as an exhibit, (c) authenticated by the trial judge, and (d) included in the transcript of the evidence transmitted to this Court.

Id. at 131 (citations omitted). Because the record is incomplete, "[w]e must conclusively presume the ruling of the trial court was correct." Id. (citing State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); State v. Baron, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)). Accordingly, we conclude that this claim is waived.

However, even if we were to reach the merits of this issue, we would have no trouble concluding the claim that the search warrant affidavit did not establish probable cause is without merit.[2]

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." Id. Moreover, the affidavit must contain more than mere conclusory allegations on the part of the affiant. Id. A finding of probable cause made by an issuing magistrate is entitled to great deference. State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982), cert. denied, 459 U.S. 1137, 103 S. Ct. 770, 74 L. Ed. 2d 983 (1983)). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993) (citing State v. Jacumin, 778 S.W.2d 430, 431-32 (Tenn. 1989)).

According to the copy in the technical record, Deputy Martin's affidavit in support of the application for the search warrant states in pertinent part as follows:

> That the affiant is a deputy with the Warren County Sheriff Department. That he has been a deputy with the Warren County Sheriff Department for the last two and a half years. He has a total of four and a half years experience as a patrol officer to include his time with the Warren County Sheriff's Department as well as time with the Van Buren County Sheriff's Department. Affiant has attended several specialized schools in the identification of drugs by smell and sight and in the identification of the equipment and materials used in the manufacture of methamphetamine. Affiant is familiar with the manufacture of methamphetamine and the items used to manufacture

_____

[2]Since the trial court's order overruling the motion to suppress found the search warrant established probable cause for the search, we presume the converse of this was the infirmity alleged by the defendant in his motion to suppress.

methamphetamine based upon in-service training that he has received and his experience in the field. Affiant has been present at the sites of approximately thirty complete or partial methamphetamine laboratories and has been involved in the investigation of these laboratories.

I am aware based on my experience and training that drug traffickers may maintain records of their drug transactions either written or electronically and maintain telephone records of their contacts. Some drug traffickers in methamphetamine have been known to manufacture their methamphetamine and maintain the equipment on their property. Some drug traffickers only reveal part of their drug operation to the individuals that buy illegal drugs from them and keep concealed from their customers the various locations they maintain their illegal drugs and other items associated with the illegal drug activity. It has been my experience that drug traffickers may have items that are directly or indirectly items associated with the sale and distribution of those illegal drugs on their property other than the location revealed to the individuals making the purchases. These items may include but not limited to scales, packaging materials such as baggies, cash from sales, evidence relating to the manufacture of methamphetamine including but not limited to: glassware, burners, tubing, chemical containers, labels off chemical containers, coffee filters, jars, beakers, glass containers, precursor chemicals and substances associated with the manufacture of methamphetamine including but not limited to ephedrine or pseudoephedrine, (sulfuric, muriatic, hydrochloric and other) acids, brake cleaner, iodine (liquid or crystals), red phosphorus, Coleman fuel, denatured alcohol, acetone, lithium batteries, isopropyl or rubbing alcohol, anhydrous ammonia, ether, and drain cleaner/lye.

In private residences where drug activity is taking place some drug traffickers will associate and have others at the location involved in the illegal criminal activity involving drugs. Based on my training and experience that other individuals at this location will be involved in drug activity of some type. I have also learned through my experience that drug traffickers frequently hide items related to the production of methamphetamine or sale of methamphetamine in outbuildings or vehicles on their property.

On August 24, 2001, Deputy James Ramsey and I went to the residence of Bradley Lonsinger at the address described herein for the purpose of serving an arrest warrant on Bradley Lonsinger. Officer

James Ramsey stated to me that he observed lights on at one end of the trailer but that someone turned them out after we arrived. He also stated that once we started knocking on the door you could hear people scrambling around in the trailer[.] I could also hear a considerable amount [of movement in the trailer. It took approximately twenty minutes to get anyone to come to the door. While we waited for some one to come to the door, both Deputy Ramsey and I noted a strong odor emanating from the trailer. When Bradley] Lonsinger allowed us to enter the trailer we could smell an odor that is associated with methamphetamine manufacture. The odor was similar to the odor of battery acid and was strong enough inside the trailer to make my eyes water. Deputy James Ramsey, who also noted this odor has been a road deputy with the Warren County Sheriff's Department since September, 1999, and he has been present during the processing of approximately five methamphetamine laboratories and is familiar with the odors generated by such laboratories.[3]

In denying the defendant's motion to suppress, the trial court made the following findings of fact and conclusions of law:

This cause came on to be heard . . . upon the motion to suppress filed by the defendant in this cause, argument of counsel, and the record as a whole from all of which this Court finds that the affidavit signed by Sergeant Chad Martin of the Warren County Sheriff's Department on August 24, 2001, sets forth sufficient probable cause to justify the issuance of the search warrant which was issued in this matter.

It is well established in Tennessee that the odor of an illegal substance, either alone or in conjunction with other facts and circumstances, can provide sufficient probable cause, depending on the situation, for either a warrantless search or the issuance of a search warrant. See State v. Hughes, 544 S.W.2d 99, 101 (Tenn. 1976) (holding that the odor of marijuana emanating from a vehicle constituted probable cause for a police officer to believe that the vehicle contained contraband marijuana); Hart v. State, 568 S.W.2d 295, 296 (Tenn. Crim. App. 1978) (holding that "officers' search of the vehicle was proper, based upon the independent probable cause ground of the marijuana odor" coming from the vehicle); Hicks v. State, 534 S.W.2d 872, 873-74 (Tenn. Crim. App. 1975) (stating that "[t]he principal question presented here is whether or not the smell of marijuana emanating from the defendant's car furnished probable cause to enable an officer, who had stopped the vehicle for a traffic offense, to search the vehicle. We hold that it did."); State v.

---

[3]The technical record in this case was deficient in that the portion of the affidavit in brackets was omitted as a result of a copying error; however, we were able to obtain the missing portion from the Warren County Circuit Court Clerk.

Paul Anthony Wright, No. W2001-02574-CCA-R3-CD, 2003 WL 1860526, at **9-10 (Tenn. Crim. App. Apr. 7, 2003) (holding that a search warrant affidavit reciting, *inter alia*, the affiant's experience, training, and observation of both "the distinct odors associated with the manufactor [sic] of methamphetamine" and other items associated with such a manufacturing operation near the defendant's house and in his vehicle was sufficient to establish probable cause for the issuance of a search warrant of defendant's home); State v. Danny Davidson, No. W2001-00118-CCA-R3-CD, 2002 WL 1482720, at *1 (Tenn. Crim. App. Feb. 26, 2002) (a sufficiency of the evidence case in which a valid search warrant of a home was issued based on an officer's recognition of a "strong chemical odor" as "that from a possible methamphetamine lab"), perm. to appeal denied (Tenn. July 8, 2002).

In the present appeal, the deputies, while in the process of lawfully serving an arrest warrant, smelled a strong odor associated with the manufacture of methamphetamine in and around the defendant's mobile home. Additionally, the deputies observed suspicious behavior during the course of the arrest, including the fact that it took the defendant approximately thirty minutes to answer the door, the sudden turning off of lights upon their arrival, and people "scrambling around" inside the residence while the deputies leisurely enjoyed the outdoor scenery. All of these facts and circumstances led the deputies to believe that illegal activities were taking place inside the defendant's residence, and were recited in the affidavit supporting the search warrant. The record fully supports the determination of the trial court that the search warrant affidavit was sufficient to establish probable cause for a search of the defendant's property.

## II. Sufficiency of the Evidence

The defendant also contends that the evidence is insufficient to sustain his conviction for the attempted manufacture of a Schedule II controlled substance.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction, the State had to prove beyond a reasonable doubt that the defendant knowingly attempted to manufacture methamphetamine, a Schedule II controlled substance. See Tenn. Code Ann. §§ 39-17-408, -417. A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b). No methamphetamine was found in the defendant's home, and he was charged with attempt, rather than the completed offense. Also, no ephedrine or pseudoephedrine was found in the home, and Deputy Martin testified that one cannot manufacture the finished product, methamphetamine, without these precursors. However, while executing the search warrant, deputies did find thirty-seven items associated with the manufacture of methamphetamine. Testimony at trial established that these items are commonly used in conjunction with one another to manufacture methamphetamine, and the jury was shown photographs of these items. Two of the HCL generators were still smoking when the deputies discovered them, and other containers had liquid residue in them. The deputies testified as to the overwhelming odor in the defendant's home which was, in their experience, only associated with the manufacture of methamphetamine. Viewed in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the defendant was attempting to manufacture methamphetamine in his home. The jury could also infer that the approximately thirty minutes that passed between the time the deputies initially knocked on the defendant's door until he answered was sufficient time to dismantle the methamphetamine lab and possibly dispose of necessary precursors or finished product. Accordingly, we conclude there is sufficient evidence to support the defendant's conviction.

## CONCLUSION

Having reviewed the record, we conclude that the evidence is sufficient to support the defendant's conviction and that the trial court did not err in denying the defendant's motion to suppress. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE