IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

**STATE OF TENNESSEE v. JORDAN WORTHINGTON**

**Criminal Court for Davidson County**
**No. 2025-B-1634**

_____

**No. M2025-01269-CCA-R8-CO**

_____

**ORDER**

This matter is before the Court upon motion of the Defendant, Jordan Worthington, for review of the trial court's order denying his motion to modify the conditions of his pretrial release. *See* Tenn. R. App. P. 8; Tenn. Code. Ann. § 40-11-144. The State opposes.

**Background**

According to the information before this Court, the Defendant is charged with theft of a vehicle valued between $10,000 and $60,000, a class C felony, possession of a weapon with intent to go armed, a class E felony, possession of a weapon with intent to go armed during a dangerous felony, a class C felony, reckless endangerment of an occupied habitation, a class C felony, two counts of aggravated assault while acting in concert, a class B felony, facilitation of burglary of a motor vehicle, a class E felony, and attempted first degree murder, a class A felony. The Defendant's bail was initially set at $435,500 after his arrest on February 14, 2025, but following a bond hearing in general sessions court, that amount was raised to $510,500. In the motion to modify the conditions of his pretrial release, filed on April 3, 2025, the Defendant essentially asked the court to reduce the amount of his bond. On May 29, 2025, during the hearing on that motion, the trial court heard arguments from the parties and was asked to consider the recordings of testimony from earlier hearings in the case. On June 24, 2025, the trial court filed its written order denying the Defendant's motion. The Defendant now seeks review of that order.

**Rule of Appellate Procedure 8**

Rule 8 provides the procedural framework for obtaining appellate review of a trial

court's actions regarding a defendant's release. Tenn. Code Ann. § 40-11-144. In order for this Court to conduct its review, and because generally there is no record on appeal when a defendant seeks review of a trial court's actions in this type of situation, it is a defendant's responsibility to provide this Court with an *ad hoc* record of the proceeding below. The Defendant's motion is adequate for this Court to conduct its review.

**Pretrial Release**

Article I, section 15 of the Tennessee Constitution guarantees a defendant the right to bail in all except capital cases. *See State v. Burgins*, 464 S.W.3d 298, 306 (Tenn. 2015); *see also* Tenn. Code Ann. § 40-11-102 ("Before trial, all defendants shall be bailable by sufficient sureties, except for capital offenses where the proof is evident or the presumption great."). Similarly, excessive bail is expressly prohibited by Article I, section 16 of the Tennessee Constitution. *See State ex rel. Hemby v. O'Steen*, 559 S.W.2d 340, 341-42 (Tenn. Crim. App. 1977).

Initially, this Court observes that a trial court has the authority to release a defendant prior to trial on his or her own personal recognizance or upon an unsecured bond. Tenn. Code Ann. § 40-11-115. If, however, the trial court determines a defendant does not qualify for release under the provisions of § 40-11-115, the court shall then "impose the least onerous conditions reasonably likely to assure the defendant's appearance in court," which may include the posting of a secured bond. Tenn. Code Ann. § 40-11-116 and -117.

If a secured bond is ordered, and to assist the trial courts in determining an appropriate amount, our legislature has directed that bail "shall be set as low as the court determines is necessary to reasonably assure the appearance of the defendant as required." Tenn. Code Ann. § 40-11-118(a). Furthermore, "in determining the amount of bond necessary to reasonably assure the appearance of the defendant while at the same time protecting the safety of the public," the trial courts shall consider the following factors:

(1)   The defendant's length of residence in the community;
(2)   The defendant's employment status and history and the defendant's financial condition; provided, that, the defendant's ability to pay shall not be considered;
(3)   The defendant's family ties and relationships;
(4)   The defendant's reputation, character and mental condition;
(5)   The defendant's prior criminal record, record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;
(6)   The nature of the offense and the apparent probability of conviction and the likely sentence;

(7)      The defendant's prior juvenile court record, as authorized by § 37-1-133(b)(1), and prior criminal record and the likelihood that because of the records the defendant will pose a risk of danger to the community;

(8)      The identity of responsible members of the community who will vouch for the defendant's reliability; . . .; and

(9)      Any other factors indicating the defendant's ties to the community or bearing on the risk of the defendant's willful failure to appear . . .

Tenn. Code Ann. § 40-11-118(b). These factors are similar to the ones the court must first consider when deciding whether to release a defendant on his or her own recognizance. *See* § 40-11-115(b).

"The trial court has very wide latitude in setting bail" and this Court should be "most reluctant to second-guess" the trial court's decision. *State v. Melson*, 638 S.W.2d 342, 358 (Tenn. 1982). Indeed, this Court reviews the actions of a trial court regarding a defendant's release under an abuse of discretion standard. *See*, *e.g.*, Tenn. Code Ann. § 40-26-103. Our supreme court has stated that the abuse of discretion standard of review is a "less rigorous review" of a trial court's decision and does not permit this Court to substitute its judgment for that of the trial court. *State v. McCaleb*, 582 S.W.3d 179, 185 (Tenn. 2019) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

## Discussion

In its written order, after reciting the relevant law discussed above, the trial court discussed the facts presented and issued the following ruling:

The Court has considered these factors in light of the evidence presented. As to factors (1), (2), and (3) of Tenn. Code Ann. § 40-11-118, the Court considered the testimony of Emaria Gentry, the Defendant's girlfriend, from the bond hearing in Davidson County General Sessions Court on April 4, 2025. Ms. Gentry testified that she has known the Defendant for six to seven years, and he has lived in Nashville during that time. His father, foster mother, and siblings also live in Nashville. Before his arrest, the Defendant lived with her and worked with her at an assisted living facility until he was fired in January 2025.

As to factor[s] (5) and (7), the Defendant has a substantial juvenile record. He was adjudicated delinquent on one count of joyriding, three counts of theft of property, and one count of aggravated robbery in 2020. In 2022, he was adjudicated delinquent for handgun possession, and in 2023, he was again adjudicated delinquent for aggravated robbery. He had three probation violations and one failure to appear. Defendant also received judicial diversion in 2024 in Sumner County.

As to factor (6) of Tenn. Code Ann. § 40-11-118, the Defendant is charged with several serious felonies [listed above] . . . If convicted of these offenses, he faces a substantial sentence, including the possibility of a minimum mandatory sentence, consecutive sentencing, and a sentence to serve in the Tennessee Department of Corrections.

The Court reviewed the March 5, 2025, preliminary hearing conducted in Davidson County General Sessions Court. The proof showed that on February 12, 2025, Kalob Creighton, Emily Creighton, his wife, and their two-year-old son were in their bedroom around 10 p.m. Mrs. Creighton and the child were asleep. Mr. Creighton noticed a strange light coming from the partially open window and walked over to investigate. He saw a young person with a hoodie tight around his face trying to get into his truck. He also noticed a four-door grey car. He was able to see the driver but none of the other occupants. Without lifting the blinds, he yelled "hey" to scare him away. Immediately, shots rang out, and he saw a muzzle flash.

He dove onto his child and wife and rolled them off the bed and covered them with his body. There were five or six shots before a brief lull in fire. More shots rang out. He realized that he couldn't stand up. He pulled himself and his family across the floor into his office where he retrieved his gun while his wife called the police and put pressure on his wound. He was hit on the left side of his pelvis. The bullet shattered his pelvis before lodging in his spine, where it remains. He was in the hospital for seven to eight days. He estimated that there were six shots initially and then seven shots later.

Detective Joshua Belk is the lead detective. On the night of the crime, the crime scene unit collected evidence of the crime from the interior and exterior of the home. There were multiple bullet defects in the bedroom window. Inside the residence, there was one ballistic fragment found lodged in the wall. Six .40 casings were collected from the outside of the house. At a neighboring house, officers found one .45 casing. The following day, the

owner of that home found a bullet hole in his garage door and a projectile in the truck of his car that was parked inside.

Det. Belk collected surveillance footage from a neighbor's residence. It showed the tail end of a Honda Civic driving toward the victim's residence. The vehicle went out of sight. Thirty-one seconds later, the video caught the sound of eight gunshots. Thirteen seconds after, there was another gunshot, and the car left.

On February 14, 2025, officers observed a vehicle matching the description of the vehicle used in the crime pulling into a gas station. The Defendant exited the vehicle, and officers saw a gun in the waistband of his pants. When he returned to the vehicle, officers followed him. The license plate did not match the vehicle, so officers conducted a traffic stop. The vehicle was later confirmed to be stolen. Officers searched the vehicle and located a black .40 pistol under the passenger seat. They also found three shell casings, two .40 and one 9mm, under the windshield wipers. The casings from the car and home were later matched to the gun found in the traffic stop.

The Defendant was taken into custody. He spoke briefly with Det. Belk. He said he bought the Honda Civic from Facebook six to seven months earlier for $10,000. He said he bought the pistol four to five days before - several days before the crime. A week later, William Hope was arrested. He and Det. Belk discussed several vehicle thefts. He said that he was the person who pulled on the truck's door handle. He said that the Defendant was the driver, and that he was the passenger. He claimed that someone named "Chunky" was in the back passenger seat and shot at the first home. He claimed that another occupant named "Keypad" was sitting behind the Defendant and fired the shot at the neighbor's home.

Det. Belk executed search warrants on the Defendant's and Mr. Hope's phones. He recovered texts between the Defendant and "Chunky" where they discussed stealing vehicles. The Defendant discussed the Honda Civic and sent a photo of himself in the vehicle to another user on January 16, 2025. The vehicle was reported stolen on January 20, 2025, from an assisted living facility. Mr. Hope sent links to articles about the crimes to the Defendant. Another person also sent the Defendant those links and said that he "hopes Chunky keeps his mouth closed." Det. Belk opined that most of the data on the Defendant's phone was about stealing vehicles.

5

The Court also reviewed the April 4, 2025, bond hearing conducted in Davidson County General Sessions Court. The defense called Emaria Gentry, the Defendant's girlfriend. She testified that she was with the Defendant and Mr. Hope in the Honda Civic on the day of the Defendant's arrest. She testified that she saw Mr. Hope with a black gun with an extended clip in his waistband that was similar to the one later recovered by police.

Shortly after the Defendant's arrest, Mr. Hope reached out to Ms. Gentry via Instagram. He sent several voice messages that were recorded and presented to the Court at the hearing. Mr. Hope stated that he should have never given the Defendant the gun and felt bad that the Defendant was in that position.

The defense next called Zya Jones, a friend of the Defendant. She testified that she knew Mr. Hope through the Defendant and had seen him with a gun similar to the one used in the crime. Ms. Jones also testified that Mr. Hope confessed to her that he was the shooter. [FN omitted].

Detective Belk was recalled and testified that the Defendant told someone over text that the Honda Civic hadn't been used since 2022 and wouldn't be reported stolen. He testified that he found several photos of guns on the Defendant's phone but could not recall if he saw a photo of the gun used in the crime.

The bond statute requires this Court to assess the strength of the State's case and the likelihood of conviction. Considering the proof before it, the Court concludes that the likelihood of conviction on the offenses is high. The Defendant argues that he is not criminally responsible for the crimes of the others in the car; however, the culpability of all the occupants is still in question. Per the Defendant's own statement, he purchased the gun shortly before the murder. The gun was found in the car he allegedly stole and within his reach. This gun fired the shots that injured Mr. Creighton and could have injured his family. The defense argues that Mr. Hope has taken responsibility for the shooting, but Mr. Hope's statements are contradictory. He told the Defendant's girlfriend that he owned the gun, and he told the Defendant's friend that he was the shooter. When confronted by Detective Belk, he said that "Chunky" and "Keypad" - conveniently the suspects that have not yet been apprehended - were the shooters. Mr. Hope's inconsistencies and the culpability of the participants will ultimately be determined by the jury at trial. However, the proof shows that the Defendant was present at the crime, in a stolen vehicle. Two days later, he was

apprehended in the same stolen vehicle with casings from the crime under the windshield wipers and the gun used in the crime within his reach.

Given the evidence and applicable law, the Court concludes that a substantial bond is warranted to assure the Defendant's appearance in court and to protect the safety of the public. Although the Defendant has ties to the community, the Defendant's criminal history shows that he has a history of committing similar crimes. The Defendant has violated previous probationary sentences and failed to appear in court.

The Defendant is a danger to the community. He had no hesitation participating, in some capacity, in an attempted theft while carrying a weapon and with three others who also intended to commit the crime and were armed. The victim was severely injured and, but for his actions to protect himself and his family, the Defendant could very easily be facing additional charges including homicide.

Finally, the likelihood of conviction is high, and the Defendant faces a serious sentence if convicted. The Court concludes that the Defendant has little regard for court orders or the rule of law and that he is a danger to the community. The current bond amount is thus reasonable and necessary to ensure the Defendant's presence in court and to protect the safety of the public.

At the outset of his motion before this Court, the Defendant "respectfully submits that this case presents an opportunity - and indeed a constitutional necessity - for Tennessee courts to reconsider and clarify the scope of bail protections under the Tennessee Constitution, including Article I, Sections 8, 15, and 16, and to evaluate the continued validity of precedents that permit unaffordable monetary bail without individualized findings." The Defendant further states he "is advocating to this Court for a change in the law" regarding "the scope of bail protections under the Tennessee Constitution." To that end, he requests "guidance for future bail determinations in general sessions and trial courts across Tennessee." Those requests are beyond the scope of what Rule 8 contemplates. Rule 8 provides a procedure for appellate courts to review whether a trial court abused its discretion in "granting, denying setting or altering conditions of [a] defendant's release." Tenn. R. App. P. 8(a). Accordingly, the Court declines the Defendant's request to reconsider, clarify or change the scope of bail protections in Tennessee during its consideration of this Rule 8 motion. Similarly, the Court does not deem it necessary in its review of the motion at hand to offer advice or "guidance for future bail determinations in general sessions and trial courts."

The crux of the Defendant's argument is that the current amount of his bond is unconstitutionally excessive because he simply cannot afford it. He also argues the trial court's reliance on his prior record as a basis for concluding he is a danger to society violates the presumption of his innocence on the current charges. The Defendant also complains the trial court's delay in holding a hearing on his motion to reduce his bail violated his right to due process. The State counters that the trial court considered the applicable law and properly exercised its discretion in accordance therewith.

This Court has reviewed all of the material provided by the Defendant and has considered the arguments of the parties. As discussed above, the legislature has established a statutory procedure for the trial courts to follow in setting a secured bond as low as is necessary to reasonably assure the appearance of the defendant while at the same time protecting the safety of the public. The trial court clearly followed that procedure in this case before ruling on the Defendant's motion. It is evident the trial court placed greater emphasis on the nature of the charges, the likelihood of conviction and the Defendant's history of probation violations in declining to reduce the bond amount. That was within its sound discretion in determining the amount of bond necessary to reasonably assure the appearance of the defendant while at the same time protecting the safety of the public. Moreover, there is simply no indication the trial court prejudged the guilt of the Defendant in this case by discussing his prior record, as it was permitted to do.

In essence, the Defendant complains the existing bond violates his constitutional and statutory rights because he is financially unable to satisfy that amount and obtain his release from custody pending the conclusion of the prosecution against him. As discussed above, both the Tennessee Constitution and the applicable statute mandate that all noncapital defendants "shall be bailable by *sufficient sureties*." Tenn. Const. art. I, § 15; Tenn. Code Ann. § 40-11-102 (emphasis added). The Constitution also prohibits excessive bail. Tenn. Const. art. I, § 16. To that end, "it would be unconstitutional to fix excessive bail to assure that a defendant will not gain his freedom." *Hemby*, 559 S.W.2d at 342. However, there is nothing before this Court indicating the trial court intentionally set a monetary bond solely to punish the Defendant or knowing he may not be able to afford it. *See Melson*, 638 S.W.2d at 358; *In re: Sanford and Sons Bail Bonds, Inc.*, 96 S.W.3d 199, 202 (Tenn. Crim. App. 2002); *State v. Waldo Wiggins, Jr.*, No. W2000-02766-CCA-R3-CD, 2001 WL 1690193 (Tenn. Crim. App., May 28, 2002). To the contrary, the trial court followed the statutory guidelines before ruling. Furthermore, the Defendant's complaint about the delay in the hearing on his motion in the trial court is now moot because he was afforded that hearing.

The code requires an individualized inquiry into each defendant's condition. The trial court did so here. Again, this Court reviews the decision of the trial court under an abuse of discretion standard. That standard does not permit this Court to substitute its

judgment for that of the trial court. Thus, even if this Court would have ruled differently, the information before this Court reveals the trial court did not apply an incorrect legal standard or reach a decision which is against logic or reasoning.

## Conclusion

For these reasons, the Defendant's Rule 8 motion is hereby denied. Costs are taxed to the Defendant.

Holloway, Easter, Ayers, JJ.